OPINION OF THE COURT
Kevin C. Fogarty, J.
This proceeding is brought pursuant to section 384-b of the Social Services Law to transfer custody and guardianship of Sylvia Mendes (born July 4, 1970) and Alicia Mendes (born May 3, 1972) to the Cardinal McCloskey School and Home on the ground that the respondent, Manuela Mendes, by reason of her mental illness, is presently and for the foreseeable future unable to provide proper and adequate care for said children. Said mental illness is manifested by disorder and disturbance in behavior, feeling, thinking, and judgment to such an extent that if the children were returned to their mother they would be neglected children and their mental and emotional well-being would be endangered.
The respondent who was born and raised in Cuba lived there until 1970 when she moved to New York City. She reads and writes Spanish but neither reads nor speaks English. She is the mother of six children: Maria 20, Estrellia 19, Lazaro 15, Maria Josepha 13, Sylvia 9, and Alicia 7. The four young *359 est children are placed with the petitioner agency but only the latter two are involved in this petition.
The natural father is reportedly in Cuba but there has been no contact with him for over two and one-half years.
The respondent has an extensive record of hospitalizations since her arrival in New York and there are reports that she was hospitalized while in Cuba as well.
Her history of hospitalization is as follows: Bronx State Hospital from August 3, 1971 to January 26, 1972; Lincoln Hospital for nine days for observation in June, 1973; Bronx State Hospital again from February 15, 1974 to November 1, 1974, from November 18, 1974 to December, 1974, and from February, 1978 to December 15, 1978.
The initial admission to Bronx State Hospital was on a two-physician certification which indicated an earlier psychiatric "attention” from 1965 to 1966 following the birth of her fourth child. The record stated that the respondent had been disorganized and had mistreated her children for the entire year that she had been in the United States.
Her mental condition showed she was oblivious to the statements of her sister, carried a knife, undressed in public, and physically abused the children. She showed loosening of associations and bland effect grossly inappropriate to the circumstances of the interview. She was described as acutely psychotic, belligerent, assaultive at times, and agitated and unpredictable. The final diagnosis was psychotic depressive reaction.
Dr. Robbins, a court-appointed psychiatrist, testified that the respondent was schizophrenic chronic undifferentiated type, that she had vague paranoid ideas, and that she heard voices.
Sylvia and Alicia were placed with the petitioner on October 6, 1971 and May 12, 1972 for 16 months and 9 days, respectively.
The respondent herein argues (1) that paragraph (c) of subdivision 4 and paragraph (a) of subdivision 6 of section 384-b of the Social Services Law are unconstitutional on two grounds, i.e., vagueness and the failure to afford the respondent mother her due process rights; and (2) that section 384-b of the Social Services Law and section 1012 of the Family Court Act do not satisfy the requirement of definiteness under the due process clause.
*360 I
Vague statutes may offend the Constitution in three ways: (1) they may trap the innocent by failing to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly; (2) they may result in arbitrary and discriminatory enforcement in the absence of explicit guidelines for their application, or (3) they may inhibit constitutionally protected activity. (Grayned v City of Rockford, 408 US 104, 108-109.)
Unlike the typical statute attacked on vagueness grounds, section 384-b of the Social Services Law does not prohibit or regulate any particular conduct. The requirement of fair notice that the contemplated conduct is forbidden by statute has no relevance here because the statute applies only to a parent incapable of conforming his conduct to avoid the effect of the statute. The requirement that parental inability to meet the child’s essential needs must be affirmatively demonstrated negates, this court believes, the respondent’s notice argument.
The second test of arbitrary and discriminatory enforcement as a result of the lack of explicit standards raises a more serious question. It is in this area that the lack of a dispositional hearing would be fatal. (See Matter of Gross, 102 Misc 2d 1073.) However, such an obstacle is not present in this case as the parties have stipulated to a dispositional hearing and one was, in fact, held, thus avoiding the automatic and arbitrary granting of guardianship and custody to the petitioner agency as required by the statute.
Lastly, although fundamental constitutional rights are involved in the instant proceeding, there is no prohibition of any constitutionally protected activity here.
According to the United States Supreme Court, the root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing statues, "both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.” (Colten v Kentucky, 407 US 104, 110.)
Impossible standards are not required and lack of precision is permissible as long as the prohibited practice is one commonly understood. (Miller v California, 413 US 15, 27, n 10.)
*361 This court has found that the respondent is mentally ill and will be for the foreseeable future.
If there is vagueness in the present statute it may well lie in the concept of "foreseeable future” and in a different case it may not withstand a constitutional attack for definiteness. However, on the record before this court, the foreseeable future clearly encompasses the remaining childhood years of Sylvia and Alicia.
For these reasons, this court believes that the respondent’s attack on vagueness must be rejected.
II
If there is a constitutional defect in section 384-b of the Social Services Law, and this court believes that there is, it lies not in the area that the respondent asserts but rather in the excess of the State’s intervention in the respondent’s constitutionally protected rights.
The strict scrutiny test of review applies by reason of the statute’s infringement on the fundamental rights of parents. The State of New York has a substantial interest in providing for the placement of foster children in a permanent stable home. Thus, the first facet of the strict scrutiny test is satisfied. The second facet however requires that the statute be so narrowly drawn that there appears to be no other reasonable alternative for achieving the legitimate goal which has a less severe impact on the fundamental rights involved. (See Shapiro v Thompson, 394 US 618; Dunn v Blumstein, 405 US 330.)
In a long series of decisions, the United States Supreme Court has held that "even though the governmental purposes be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose.” (Shelton v Tucker, 364 US 479, 488.)
The right of privacy is not absolute, but must be balanced against important State interests. (Roe v Wade, 410 US 113, 154.) The State as parens patriae may restrict a parent’s control in many ways. (Prince v Massachusetts, 321 US 158, 166.)
However, in the present case, there is no judicious balancing *362 of parental rights, State interest, and the rights of the child, the latter of which are also fundamental personal rights within the meaning of the Fourteenth Amendment. (Matter of Gault, 387 US 1.)
The eminent child rights authorities, Joseph Goldstein, Anna Freud, and Albert J. Solnit in their work Beyond the Best Interests of the Child describe a placement standard which they call "the least detrimental alternative for safeguarding the child’s growth and development.” This concept is defined as: "that specific placement and procedure for placement which maximizes, in accord with the child’s sense of time and on the basis of short-term predictions given the limitations of knowledge, his or her opportunity for being wanted and for maintaining on a continuous basis a relationship with at least one adult who is or will become his psychological parent.” (Goldstein, Freud, Solnit, Beyond the Best Interests of the Child, p 53 [1973].) While this concept is not applied to the mentally ill or mentally retarded parent in their newest work, Before the Best Interests of the Child, it does express the constitutional limits that a State may go to in its intervention into a fundamental right.
The question of termination of parental rights has been dealt with by courts throughout the country. A recent Pennsylvania case found no constitutional infirmity in its statute. However, in a strong dissent, Justice Nix of the Pennsylvania Supreme Court stated: "Since the classification drawn by the majority’s construction * * * directly impinges upon involuntarily incapacitated parents’ rights to the companionship, care and custody of their children, only a compelling state interest can justify the classification. I have grave doubts that the state’s admittedly valid interest in protecting minor children is sufficiently powerful to legitimize the classification. Furthermore, I would submit that even if this state interest is considered to be a 'compelling’ one, there are less drastic alternatives available (e.g., continued foster home care), short of absolute termination of parental rights, to promote this state interest. The state’s interest is that of insuring that the essential needs of the child are met. In cases involving no parental misconduct, such as the instant case, this interest is sufficiently promoted by custody awards. ” (Matter of William L., 477 Pa 322, 367-368 [emphasis added].)
In Matter of Sanjivini K. (47 NY2d 374), the Court of Appeals held that parental rights may be terminated only *363 upon a finding as proscribed by statute. The court rejected "no fault” termination of parental rights. (See Carrieri, Foster Child: Termination of Parental Rights, NYLJ, Nov. 19, 1979, p 1, col 2.)
The least restrictive alternative has also been supported by Judge Fuchsberg in a concurring opinion in which he commented: "where there has been an unusually long separation and fostering of new ties, I do not believe, simply because the placement was statutory and the permanent neglect proceeding was decided in favor of the mother, that custody would have to be returned to the mother. Once the foster relationship has, willy-nilly, shifted from a 'temporary’ to a 'permanent’ one, best interest factors in another case could contraindicate disruption of that relationship and instead dictate an opposite result” (Matter of Sanjivini K., supra, at p 383).
Section 384-b of the Social Services Law exceeds valid and necessary State interest when it mandates custody and guardianship be given to an agency and the parental rights terminated.
"The child’s interests are often balanced against and frequently made subordinate to adult interests and rights. Moreover, and less forthrightly, many decisions are 'in-name-only’ for the best interests of the specific child who is being placed. They are fashioned primarily to meet the needs and wishes of competing adult claimants or to protect the general policies of a child care or other administrative agency.” (Goldstein, Freud, Solnit, Beyond the Best Interests of the Child, p 54.)
Adoption by loving and caring adults differs from foster care by loving and caring adults only in the added protection and security that it provides for the adults not the child. A child knows only that it has a stable, dependable, and loving parent, be it biological, adoptive, foster, surrogate, or psychological.
There are at least two ways a child might be harmed by termination. First, if a child is attached to her parents, termination may harm the child by preventing continued contact after placement. While some children come to view their foster parents as their "psychological parents”, several studies have found that other children in placement remain strongly attached to their natural parents, even if the parents visit relatively infrequently or the placement is of long duration. (28 Stanford L Rev 623, 672.)
A child may even benefit from having two sets of "parents” *364 especially in situations where the natural parents visit frequently. The natural parents’ continued presence may prevent the child from feeling abandoned by them. (Huttner, The Importance of Natural Parents to Child in Placement, Child Welfare, 175.) Even if the natural parents visit relatively infrequently, the child may suifer emotional problems if contact with the parents is totally precluded. Recent studies of adopted children indicate that many adoptees wish to know their natural parents and may even wish to return to them. (28 Stanford L Rev 623, 672, n 203, citing Wedge, Growing Up Adopted [1972], pp 168-169; see, also, Alma Soc. v Mellon, 601 F2d 1225.)
The respondent, Manuela Mendes, has consistently and faithfully visited her children. Concededly, her communication with them is very limited not only because of her mental limitations but also because her children have never been taught Spanish, her only tongue.
It is not the role of the court to supplant the Legislature in fashioning remedies for social ills. However, where the Legislature is aware of the problem[1] but has not acted then the court has no alternative but to protect the fundamental rights of parents and of children.
In the present case, section 384-b of the Social Services Law requires termination of parental rights because for the foreseeable future the respondent is unable to provide for the child. It is for this period of time, this "foreseeable future”, that the State has a valid interest in intervening. It is for this period that a parent’s rights may validly be superseded. It is for this period that foster parents should have the security of knowing that the child cannot be removed from them. Most importantly, it is for this period that the child has a paramount right to a stable and secure parent-child psychological relationship. Custody and guardianship in the foster parent *365 provides all of these protections without infringing upon the ultimate constitutional rights of the mother and child. (Matter of Bennett v Jeffreys, 40 NY2d 543.)
It must be understood that this court is not being asked to return the children to their mother at this time or for the foreseeable future. It is being asked to terminate the parental rights of the respondent and give custody and guardianship to the petitioner agency.
The balancing of competing fundamental rights is a duty of the court. The best interests of Sylvia and Alicia Mendes will be met by assuring them that they shall continue in the care and custody of their present psychological parents who upon filing with the court a petition to so act will be given guardianship and custody of the children assuring that no one will be able to remove them without further order of the court. Insofar as the statute, section 384-b (subd 3, par [a]) of the Social Services Law, requires that guardianship shall revert back to the agency within six months if no adoption petition is filed, the court finds this to be an unconstitutional intrusion on the parent-child relationship depriving both parent and child of their fundamental rights.
Hopefully the United States Supreme Court in Doe v Delaware (407 A2d 198 [Del], review granted 445 US 942), which has been accepted for review, will give us a clearer expression of the constitutionality of no-fault termination.
In Matter of Gross (102 Misc 2d 1073, supra), this court stated its feelings with regard to the termination of parental rights without fault and so herein will only highlight portions. The discussion of fundamental rights need not be repeated. The loss of a child is clearly "as onerous a penalty as the deprivation of the parents’ freedom.” (Department of Public Welfare v J. K. B., — Mass —, —, 393 NE2d 406, 407.)
There seems to be little doubt that in terminating parental rights because of the mental illness of the respondent this court is dealing with a no-fault termination and in Matter of Sanjivini K. (47 NY2d 374, supra) New York has firmly rejected such no-fault termination.
In summary, section 384-b of the Social Services Law violates the constitutional rights of respondent mother by depriving her of her children solely because of her mental illness and by intervening into the constitutionally protected rights *366 of both parent and child beyond what is necessary to meet the State’s interest.
Therefore, the petition committing the guardianship and custody of Sylvia and Alicia Mendes to the petitioner agency is denied.
Placement of subject children is extended one year.

. Senator Joseph Pisani (principal sponsor of Social Services Law, § 384-b) speaking to the Annual Convention of Family Court Judges in Niagara Falls on September 23, 1975 stated: "Parenthetically, I might add that between the extreme poles of adoption and foster care there appears to be need for consideration of a new modality. The Report of the Temporary State Commission contains references to what I have coined as 'foster guardianship.’ There is insufficient time at this juncture to delve into its ramifications except to suggest that the Commission is studying whether or not it is feasible to create this new category, and whether it answers some of the difficult problems of the long-term, legitimate foster placement in situations where there is a natural parent and it is not appropriate to terminate the relationship between natural parent and child and thusly free the child for adoption.”