In the Matter of the Guardianship and Custody of SYLVIA M. and Another, Infants. CARDINAL MCCLOSKEY SCHOOL AND HOME, Appellant; MANUELA M., Respondent; ATTORNEY-GENERAL OF THE STATE OF NEW YORK, Intervenor.

In the Matter of the Guardianship and Custody of NEREIDA S. and Another, Infants. Law Guardian of NEREIDA S. and Another, Infants, Appellants-Respondents; CATHOLIC GUARDIAN SOCIETY, Respondent; SAMUEL L., Respondent-Appellant; ATTORNEY-GENERAL OF THE STATE OF NEW YORK, Intervenor.

First Department, July 23, 1981

APPEARANCES OF COUNSEL

In the First Above-Entitled Proceeding:

*David H. Berman* of counsel (*Gerald E. Bodell* with him on the brief and attorney), for Cardinal McCloskey School and Home, petitioner-appellant.

*Joseph Zalk* for Manuela M., respondent.

*James A. Cardiello*, Law Guardian for Sylvia M., appellant.

*Barbara H. Dildine* of counsel *(William E. Hellerstein* and *Charles Schinitsky*, attorneys and Law Guardian), for Alicia M., appellant.

*Robert J. Schack* of counsel *(George D. Zuckerman* with him on the brief; *Robert Abrams, Attorney-General)*, intervenor *pro se.*

In the Second Above-Entitled Proceeding:

*John F. McGlynn* of counsel *(William E. Hellerstein* and *Charles Schinitsky*, attorneys), for Nereida S. and Another, appellants-respondents.

*Louise G. Gans* of counsel *(Edward N. Simon, David Victor* and *Carolyn Kubitschek* with her on the brief; *Michael D. Hampden, Louise G. Gans* and *Edward N. Simon*, attorneys), for Samuel L., respondent-appellant.

*Robert J. Schack* of counsel *(George D. Zuckerman* with him on the brief; *Robert Abrams, Attorney-General)*, intervenor *pro se.*

## OPINION OF THE COURT

BIRNS, J.

The two appeals before us, involving two different sets of children, raise questions relating to section 384-b (subd 4, par [c]) and 384-b (subd 6, par [a]) of the Social Services Law.[1] Because in each case the trial court entertained a different view of the constitutionality of those sections, we

---

1. Subdivision 4 of section 384-b of the Social Services Law, insofar as it is pertinent, provides that an order committing the guardianship and custody of a child shall be granted only upon one of the following grounds:

"(c) The parent or parents * * * are presently and for the foreseeable future unable, by reason of mental illness * * * to provide proper and adequate

have chosen to consolidate these appeals and consider the conflicting claims of the parties in one opinion.

In *Matter of Sylvia M.* (104 Misc 2d 357) petitioner, the Cardinal McCloskey School and Home, appeals from an order of the Family Court, New York County (FOGARTY, J.), entered May 15, 1980, which dismissed its petition pursuant to section 384-b (subd 4, par [c]) of the Social Services Law for an order terminating the parental rights of respondent, Manuela M., on the ground, *inter alia*, of her mental illness. The court, after a fact-finding hearing, concluded that there was clear and convincing proof of mental illness rendering Manuela unable to provide adequate supervision and guidance to the children in the foreseeable future. However, following a dispositional hearing upon the consent of all counsel, the court extended the children's placement with petitioner, but dismissed the petition on the ground that section 384-b (subd 4, par [c]) and 384-b (subd 6, par [a]) were unconstitutional.

In *Matter of Nereida S.,* the children, through their Law Guardian the Legal Aid Society, appeal from an order of the Family Court, Bronx County (POLLARD, J.), entered November 15, 1979, which dismissed the petition of the Cardinal McCloskey School and Home pursuant to section 384-b (subd 4, par [c]) of the Social Services Law seeking guardianship and custody of the children on the ground that the father, Samuel L., was unfit to care for them by reason of mental illness. The petition was dismissed after a fact-finding hearing at which the court found there was insufficient proof to support a termination of parental rights based on mental illness.

The court also dismissed as without merit an attack by respondent upon the constitutionality of section 384-b (subd 4, par [c]) and 384-b (subd 6, par [a]).

care for a child who has been in the care of an authorized agency for * * * one year immediately prior to the initiation of the proceeding under this section; or

"(d) The child is a permanently neglected child."

Section 384-b (subd 6, par [a]) of the Social Services Law defines mental illness as: "[A]n affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking or judgment to such an extent that if such child were placed in or returned to the custody of the parent, the child would be in danger of becoming a neglected child as defined in the family court act."

Respondent father, Samuel L., cross-appeals from the same order to the extent that the order fails to declare the underlying statute, section 384-b (subd 4, par [c]) and 384-b (subd 6, par [a]) of the Social Services Law, unconstitutional.

■ In the case of *Matter of Sylvia M.* (104 Misc 2d 357, *supra*) we disagree with the Family Court that the provisions of the Social Services Law which provide for the termination of parental rights because of mental illness are unconstitutional. We find that the challenge to the constitutionality of the statute is without merit.

■ ■ In the case of *Matter of Nereida S. (supra)*, we find, unlike the trial court, that there is clear and convincing proof to support a termination of the parental rights of their father, Samuel, based on mental illness. We further find, as in *Matter of Sylvia M. (supra)*, that the constitutional challenge has no validity.

A review of the pertinent facts of each case, as disclosed at the respective hearings, is appropriate at this point.

I

FACTS

*Sylvia M. and Alicia M.*

Sylvia M. was born July 4, 1970 and Alicia M. was born May 3, 1972, to Manuela M. and a father with whom there has been no contact for several years. Manuela has four other children, two of whom are over 18. Sylvia was placed with appellant Cardinal McCloskey School and Home on October 6, 1971, and Alicia was placed with appellant May 12, 1972. When Sylvia was placed, Manuela was a patient at Bronx State Hospital and she was an outpatient at Bronx State at the time of Alicia's placement.

Manuela was born in Cuba and moved to New York in 1970. Since her arrival in New York, she has been hospitalized several times as follows: Bronx State Hospital—August 3, 1971 to January 26, 1972; February 14, 1974 to November 1, 1974; November 18, 1974 to December, 1974; and February, 1978 to December 15, 1978. She was also confined to Lincoln Hospital for nine days in June, 1973.

In or about June, 1978, appellant filed a petition pursuant to section 384-b of the Social Services Law seeking an order terminating Manuela's parental rights on the ground of her mental illness, or alternatively, on the ground that she had permanently neglected the children notwithstanding the agency's diligent efforts to encourage the parental relationship. A fact-finding hearing began June 7, 1979 before Judge FOGARTY in the Family Court.

Mrs. Patricia O'Connell, a caseworker from Cardinal McCloskey School, testified that she arranged monthly visits for Manuela with her children and even made sure that Manuela got on a bus that was provided for her transportation on these visits. Mrs. O'Connell explained that she contacted Manuela's family with regard to the children, but they never responded. Because Manuela was being provided with housing and welfare assistance by Bronx State Hospital, Mrs. O'Connell felt that further assistance in these areas was not required. However, Mrs. O'Connell stated that a previous caseworker, Mr. Largo, had helped Manuela obtain welfare and had encouraged her to continue in therapy. Mrs. O'Connell expressed her opinion that the children could not be returned to their mother, because her mental illness made it difficult for her to care for them, and because she was living in housing provided by a Bronx State Hospital after-care program in which she was participating. According to Mrs. O'Connell, the children's father has never made contact with the children and could not be located, despite diligent efforts to do so. Apparently Manuela is unable to communicate with her children, as she speaks only Spanish, while the children speak only English.

The next witness at the hearing was Dr. Jay Robins, senior psychiatrist of the court's mental health service. He examined Manuela on December 11, 1978, and had reviewed her records from Bronx State Hospital. His report on Manuela was introduced into evidence, as were the hospital records. He testified that, based upon a review of her hospital records and his interview with Manuela through an interpreter, which lasted one hour, he diagnosed her condition as chronic undifferentiated schizophrenia.

During the interview she exhibited "a flat to blunt emotional response throughout the entire interview and her

emotional response or affect was—had a restricted range, restricted mobility and restricted communicability." Manuela also described to the doctor auditory hallucinations she had experienced. Although conceding that a patient suffering from chronic schizophrenia could undergo periods of remission, he concluded that such a patient could possibly improve but could not be cured. In Dr. Robins' estimation, Manuela because of her mental illness was not presently able, nor would she in the future be able to look after her children. He stated that if the children were returned to her, they would be in danger of becoming neglected children.

On cross-examination, Dr. Robins explained that in undifferentiated schizophrenia, no one set of symptoms predominates, and gave the court examples of Manuela's responses to his questions which led him to his conclusion. He repeated his position that if the children were returned to Manuela, they would be in danger of becoming neglected children and they would be likely to receive distorted communications from her. Moreover, Dr. Robins believed that she would be subject to further breakdowns.

The next witness was respondent, Manuela, who testified as to her age (43 years), her length of time in New York, and her hospitalizations to the extent she remembered them. She stated that she wanted her children back and would feel much better with them. She admitted that the last time she had her own apartment was five or six years ago.

At the close of the hearing, Judge FOGARTY dismissed the neglect cause of action (apparently because there was evidence that Manuela had visited with the children and had tried to plan for their future). The Judge stated that there was clear and convincing proof of mental illness rendering Manuela unable to provide adequate supervision and guidance to the children in the foreseeable future.

A dispositional hearing was held August 23, 1979. Mrs. O'Connell testified that Sylvia had been in her present foster home for two and one-half years. She stated that the family had two biological children, aged 18 and 20, and that the father worked as an accountant at Flower Fifth Avenue Hospital, while the mother was a housewife. Sylvia was characterized as well adjusted to her foster home and at-

tached to her foster family. According to Mrs. O'Connell, the foster parents were interested in adopting Sylvia.

Mrs. O'Connell testified that Alicia had been in her present foster home since she was one year old. The foster family is comprised of two parents and four biological children, ranging in age from 14 to 21 at that time. Mrs. O'Connell found Alicia very well adjusted in her foster home and the foster parents eager to adopt her.

The two children see each other about twice a month and had a "minimal relationship" with their natural mother.

During the children's visits with their mother, communication was difficult due to the language barrier. Manuela had expressed to Mrs. O'Connell a desire to care for her children, despite her outpatient status at Bronx State Hospital.

Mrs. O'Connell concluded that the children were happy where they were and that their natural mother could not care for them.

Manuela testified that her wishes for her children's custody were that "as long as they don't give them to me—I always said this. They are very well where they are."

She also admitted that her apartment was not a good place for the girls to live. She testified that she was taking Thorazine, and went to see a psychiatrist at Jacobi Hospital every time her pills ran out.

Following the dispositional hearing, Judge FOGARTY ruled that section 384-b (subd 4, par [c]) and 384-b (subd 6, par [a]) were unconstitutional, dismissed the petition and extended the children's placement for one year. We shall consider his reasons hereafter.

*Nereida S. and Cecilia L.*

Nereida S. was born March 22, 1969, and her sister Cecilia L. September 22, 1967. Both were initially placed at the Children's Center on June 26, 1971. Nereida has been living in her current foster home since April 30, 1973, where she was joined by her sister Cecilia L. May 10, 1974.

An earlier neglect petition was filed on January 6, 1971 against the children's natural parents, Samuel L. and Clo-

tida S., alleging that their eight children were being neglected. On June 22, 1971, their youngest child Gloria, 13 months of age, died precipitously while en route to Jacobi Hospital, thereby resulting in a remand of the remaining children to temporary shelters. Samuel and Clotida were arrested and charged with murder in connection with the child's death. Samuel pleaded guilty on May 17, 1978 to criminally negligent homicide and was sentenced to five years probation.[2]

On August 20, 1971, Clotida admitted that she was neglectful of her children, and following a dispositional hearing on April 12, 1972, the children were placed with respondent, the Catholic Guardian Society.

On or about November 12, 1976, respondent filed a petition in the Family Court requesting that Nereida and Cecilia and two of their siblings be placed under its guardianship and custody, on the ground that their father Samuel was suffering from a mental illness which precluded him from being able to care for his children in the present or in the foreseeable future, and that their mother Clotida was guilty of permanent neglect.[3] The children's mother there-

2. This court may take judicial notice of the records and criminal proceedings in the Supreme Court (Fisch, Evidence [2d ed, 1977], § 1065; see, also, *People v Singleton*, 36 AD2d 725). The probation report shows that between May 5, 1971 and June 26, 1971, Samuel and his wife engaged in conduct resulting in the death of their infant child, Gloria, on June 26, 1971. Court records reveal that on May 5, 1971, the police visited Samuel's home because of abusive behavior he and his wife had perpetrated on their children, including beatings with blunt instruments, pouring scalding water over the children's bodies, and at one point, placing Gloria's body into a fire on the stove.

When the police arrived at their home on June 26, 1971, Gloria, age 13 months, was dead. A subsequent medical examination revealed that the numerous contusions on her body were the result of several beatings. The autopsy report of the child stated that her death resulted from "bronchopneumonia with abscess formation, third degree flame burns of the right hand, multiple scars and burns of the trunk and extremities, old contusions of brain, starvation—homicide."

3. Section 384-b (subd 7, par [a]) of the Social Services Law defines "permanently neglected child" as: "7. (a) For the purposes of this section, 'permanently neglected child' shall mean a child who is in the care of an authorized agency and whose parent or custodian has failed for a period of more than one year following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and finan-

after executed a voluntary surrender of her parental rights and the neglect petition was dismissed. The father was hospitalized at Bronx State Hospital at the time and has since been released. On February 16, 1979, Judge POLLARD signed a notice to the Attorney-General to intervene, advising him that Samuel intended to challenge the constitutionality of section 384-b (subd 4, par [c]) and 384-b (subd 6, par [a]) of the Social Services Law.

The fact-finding hearing was begun on April 6, 1979. Testifying first was Dr. Richard Schuster, senior psychologist for the Bronx Family Court Clinic, who tested Samuel and conducted two psychological interviews with him on September 26, 1977 and October 13, 1978. He recounted that at the first interview, Samuel appeared to be a chronic schizophrenic, in that he was unable to convey simple information about his life and seemed confused and unable to follow coherent conversation. Samuel's test results were very similar to those of chronic schizophrenics, and he admitted to having experienced hallucinations, another symptom of schizophrenia. After the second interview, Dr. Schuster found Samuel's condition mildly improved. Dr. Schuster testified that Samuel would need massive help if released from the hospital, and that people with Samuel's condition were often in and out of hospitals throughout their lives. Although Samuel expressed a genuine desire to raise his family, Dr. Schuster doubted Samuel's ability to do so, and did not believe that Samuel's situation would improve in the foreseeable future. He concluded that "it would be a catastrophe for all concerned" if the children were returned to their father.

Dr. Schuster also interviewed the children. Nereida appeared somewhat depressed and expressed uneasiness at the thought of returning to her father. She expressed some fear that her father might do her harm and was sure that she wanted to remain with her foster parents.

Cecilia appeared nervous and timid, but with underlying

---

cially able to do so, notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to the best interests of the child. In the event that the parent defaults after due notice of a proceeding to determine such neglect, such physical and financial ability of such parent may be presumed by the court."

agitation and explosiveness. She adamantly did not want to live with her father and was fearful that she would be abused if returned to him. She, too, wanted to remain with her foster parents.

Dr. Schuster testified that the girls had undergone traumatic experiences while living with their parents, which would be exacerbated if they were removed from their foster home. He stated that the children have memories of being abused by their father and expressed fear of him.

The next doctor who testified was Dr. Maria Schoelly, senior psychiatrist for the Bronx Family Court Clinic. She stated that she examined Samuel on September 26, 1977 and October 13, 1978. Before her examinations, she read Samuel's records from Bronx State Hospital, where he was a patient from March 25, 1979 through May 29, 1979. After both visits, Dr. Schoelly diagnosed Samuel as a chronic, undifferentiated schizophrenic. Although Samuel's behavior had improved by the second visit, Dr. Schoelly found his basic thinking disorder unchanged, and considered Samuel's prognosis poor, with little hope for a cure in the foreseeable future. Dr. Schoelly admitted that some chronic schizophrenics experienced spontaneous cures, but asserted that such an occurrence was unpredictable, and that the longer the patient had had the disease, the more unlikely was such a cure.

Dr Schoelly concluded that if the children were returned to Samuel, they would be in danger of being emotionally and physically neglected, as he did not understand how to care for them, and that this situation would persist for the foreseeable future. She also maintained that the stress of returning the children to Samuel could exacerbate his condition.

Testifying for the father was Dr. Michael Smith, a psychiatrist in the Substance Abuse Division of Lincoln Hospital. He conceded that he had not evaluated Samuel, and had only met him a few minutes before he testified. Dr. Smith observed that chronic schizophrenia was a fairly common diagnosis, and that the diagnosis was valid only in terms of the patient's history, and not his current status. He testified that people with schizophrenic episodes lasting six months

to one year could recover sufficiently in some cases so as to be able to lead a structured life. Indeed, Dr. Smith stated that 20% of diagnosed schizophrenics could recover, although he later conceded that there was significant danger of a relapse in most cases and that the longer the duration of the illness, the more significant the chance of relapse. However, he stated that some cured schizophrenics could and did care for their own children. Dr. Smith testified that because of the nature of chronic schizophrenia, no diagnosis would be reliable without a periodic re-examination every six months. He likened the term "foreseeable future" to a medical prognosis, but doubted that there could be a "clear and convincing diagnosis" sufficient to make a long term prediction. Based upon his observance of Samuel in the courtroom, Dr. Smith concluded that he exhibited a good range of emotional responsiveness and obviously did not suffer from severe chronic, undifferentiated schizophrenia.

John Kist, a social worker for the agency who had worked with the children since January of 1975, also testified. He stated that Samuel would soon be released from Bronx State Hospital and that the children had agreed to visit with him, despite an initial reluctance to do so. Although two of Samuel's sisters had expressed interest in the children, the agency had rejected them as possible custodians of the children.

In this case, Judge POLLARD rejected the father's claim that the statute was unconstitutional. However, the Judge found there was insufficient evidence to support a finding that the father would be unable to care for the children in the foreseeable future. While he acknowledged the testimony of the court's psychologist and psychiatrist, he noted that the father had exhibited some improvement to both of them, and that their prognoses were six months old at the time of the hearing. Because of the father's long hospitalization, the Judge could not find sufficient proof of permanent neglect. Although he saw financial and emotional obstacles confronting the father, he did not warrant them sufficient to terminate his parental rights. Hence, the children were remanded to the custody of the Commissioner of Social Services for a "disposition not inconsistent with this decision."

## II

### CONSTITUTIONALITY

In each of the appeals before us, the constitutionality of section 384-b (subd 4, par [c]) and 384-b (subd 6, par [a]) of the Social Services Law is challenged insofar as those sections deal with mental illness. This issue will be explored before proceeding to other issues raised on the two appeals.

In the case of *Matter of Sylvia M.* Judge FOGARTY held section 384-b (subd 4, par [c]) and 384-b (subd 6, par [a]) of the Social Services Law unconstitutional (104 Misc 2d 357, *supra*). After reviewing all the evidence and concluding (p 361) that "the respondent is mentally ill and will be for the foreseeable future", he reviewed respondent's challenge to the constitutionality of those sections. Unable to conclude that the statute was vague, he found, however, that it represented an excessive State intervention into respondent's constitutionally protected rights; that although the State had a substantial interest in providing children with a permanent suitable home (and thus could satisfy the "strict scrutiny" test [*Quilloin v Walcott*, 434 US 246, 255]), the statute exceeded the State's legitimate interest by compelling termination of parental rights. Expressing his opinion that adoption was not the best alternative, he implied that the statute provided for "no fault" termination of parental rights by depriving parents of such rights solely on the ground of mental illness. He denied the petition and extended the children's placement for one year.

Appellant Cardinal McCloskey School challenges Judge FOGARTY's holding that the statute is unconstitutional and is joined in that position by Alicia M.'s Law Guardian and the Attorney-General of the State of New York. Both Manuela and the Law Guardian for Sylvia M. want to see Judge FOGARTY's decision affirmed.

In the case of *Matter of Nereida S. (supra)*, Judge POLLARD, in an opinion, rejected the argument of respondent father that section 384-b (subd 4, par [c]) and 384-b (subd 6, par [a]) unconstitutionally discriminated against mentally ill parents. He found that the statute reasonably promoted a public interest for children's welfare and affected

all mentally ill parents equally. He accepted the legislative findings set forth in subdivision 1 of section 384-b[4] favoring permanence in a child's home and noted that parental rights were not terminated lightly on the ground of mental illness, as the quantum of proof in such circumstances was required to be "clear and convincing" (Social Services Law, § 384-b, subd 3, par [g]).[5] Cross-appellant, the natural father, challenges Judge POLLARD's holding that the statute is constitutional.

---

4. Subdivision 1 of section 384-b of the Social Services Law provides:

"§ 384-b. Guardianship and custody of destitute or dependent children; commitment by court order

"1. Statement of legislative findings and intent.

"(a) The legislature hereby finds that:

"(i) it is desirable for children to grow up with a normal family life in a permanent home and that such circumstance offers the best opportunity for children to develop and thrive;

"(ii) it is generally desirable for the child to remain with or be returned to the natural parent because the child's need for a normal family life will usually best be met in the natural home, and that parents are entitled to bring up their own children unless the best interests of the child would be thereby endangered;

"(iii) the state's first obligation is to help the family with services to prevent its break-up or to reunite it if the child has already left home; and

"(iv) when it is clear that the natural parent cannot or will not provide a normal family home for the child and when continued foster care is not an appropriate plan for the child, then a permanent alternative home should be sought for the child.

"(b) The legislature further finds that many children who have been placed in foster care experience unnecessarily protracted stays in such care without being adopted or returned to their parents or other custodians. Such unnecessary stays may deprive these children of positive, nurturing family relationships and have deleterious effects on their development into responsible, productive citizens. The legislature further finds that provision of a timely procedure for the termination, in appropriate cases, of the rights of the natural parents could reduce such unnecessary stays.

"It is the intent of the legislature in enacting this section to provide procedures not only assuring that the rights of the natural parent are protected, but also, where positive, nurturing parent-child relationships no longer exist, furthering the best interests, needs, and rights of the child by terminating parental rights and freeing the child for adoption."

5. Section 384-b (subd 3, par [g]) of the Social Services Law states: "(g) An order committing the guardianship and custody of a child pursuant to this section shall be granted only upon a finding that one or more of the grounds specified in paragraphs (a), (b) or (d) of subdivision four are based upon a fair preponderance of the evidence, or upon a finding that one or more of the grounds specified in paragraph (c) of subdivision four are based upon clear and convincing proof."

 With regard to *Matter of Sylvia M. (supra)* the Attorney-General asserts that no party had standing to raise the constitutional issue and that, therefore, the Family Court improperly decided a hypothetical issue. In order to establish standing, a party must demonstrate that he is possessed of a right which the statute infringes, and that he is within the class of persons affected by the statute (16 CJS, Constitutional Law, § 76). It appears that the natural mother's right to raise her own children is infringed by the statute, and that, as a mentally ill parent, she is within the class of persons affected by the statute. Hence, she did have standing to raise the constitutional issue, and the court properly addressed itself to the issue.

As to *Matter of Nereida S. (supra)*, the Attorney-General asserts that the father lacks standing to raise the statute's constitutionality, but it appears that Samuel does have standing, because, as does Manuela in *Matter of Sylvia M. (supra)*, Samuel's substantive right to remain the parent of his children is threatened. The Attorney-General also contends that Samuel is precluded from raising the constitutionality of the statute, as he did not raise it below. However, the record discloses that Samuel raised the issue during the opening and closing proceedings of the hearing. Finally, the Attorney-General objects that the constitutional issues need not be reached in *Matter of Nereida S.* as the complaint was dismissed for insufficient proof. However, appellants are also challenging the finding of insufficient proof, and if they are successful, the constitutional issue will be important. Moreover, since the issue must be treated in *Matter of Sylvia M.* and it is likely that the issue will appear again in other matters, this court will review the issue in some detail.

The parties challenging the statute claim that:

(1) The parents enjoy a substantive right to remain the parents of their children;

(2) The statute denies mentally ill parents the constitutional guarantee of equal protection of the laws in that it fails to provide long-term foster care and a dispositional hearing, established legal procedures which are accorded to parents who are not mentally ill but whose custody over their children is challenged;

(3) It violates procedural due process;

(4) It is unconstitutionally vague;

(5) It violates mentally ill parents' rights to substantive due process by improperly depriving them of their parental rights because it purportedly penalizes status rather than conduct and requires automatic termination of parental rights in every case.

We hold that the challenge to the statute's constitutionality is without merit.

(1) The statute's challengers correctly assert that a parent's right to raise his child is a fundamental liberty enjoying strong constitutional protection *(Quilloin v Walcott,* 434 US 246, *supra).* Furthermore, they accurately characterize termination of parental rights as one of the most severe forms of deprivation that can be imposed upon a parent *(Matter of Peter John "DD",* 48 AD2d 956), and that only the most countervailing interests can outweigh the rights abridged by termination. Indeed, New York courts have consistently followed the United States Supreme Court's guidelines and have held that the State cannot sever family ties without a showing of abandonment, neglect, unfitness or other extraordinary circumstances *(Stanley v United States,* 405 US 645; *Matter of Bennett v Jeffreys,* 40 NY2d 543) ; and subdivision 4 of section 384-b of the Social Services Law sets forth strict standards to apply in those few situations where parental rights can be terminated. Therefore, the statute does not violate the Constitution merely because it provides for termination of parental rights.

(2) The statute's challengers claim that the statute violates equal protection by treating mentally ill parents differently from other parents and by failing to provide for long-term foster care and a dispositional hearing. Although the statute does treat mentally ill parents differently from other parents, this distinction does not violate the rights of mentally ill parents to equal protection unless it is arbitrary and capricious. In order to ascertain whether the law violates equal protection standards, the court must examine:

A. The character of the classification; and

B. The individual interests affected; and

C. The governmental interest involved.

*(Dunn v Blumstein,* 405 US 330.)

 The class created by section 384-b (subd 4, par [c]) and 384-b (subd 6, par [a]) of the Social Services Law does not include all mentally ill parents, but only those who, by reason of their infirmity are now and in the foreseeable future so unable to care for their children that their children would be in danger of suffering neglect if returned to them. Therefore, the difference in treatment is not between all mentally ill and all "sane" parents, but only between parents so mentally ill that they cannot care for their children, and all other parents, whether mentally ill or not, who can. The individual interests affected are those of the parents to raise or even maintain contact with their natural children, and the children's need for a permanent and secure home which can provide them with proper care and education (Social Services Law, § 384-b, subd 1). The State also has a substantial, if not compelling interest in ensuring that children are maintained in such homes. The statute balances the interests of the parents, children and State by requiring a clear and convincing quantum of proof that the parent's mental illness precludes him from properly caring for his child. Therefore, the statute does not violate equal protection, as it reasonably promotes a substantial State interest in the welfare of children and rests upon real and substantial differences between such mentally ill parents and all other parents, fairly balances all the parties' interests and treats all members of the class in a similar manner.

The fact that the statute does not provide for long-term foster care does not render it violative of equal protection standards. As stated in *Caban v Mohammed* (441 US 380) in reviewing equal protection claims, it is not the court's function to hypothesize on the desirability or feasibility of alternatives to the statutory scheme *(Caban v Mohammed, supra,* p 391). Furthermore, the Family Court is not foreclosed from remanding the children to long-term foster

care, as the court must always ultimately determine the child's best interests in its disposition. If the child's best interests justify long-term foster care, the statute allows for it (Social Services Law, § 384-b, subd 1, par [a], cl [iv]; § 392, subd 5-a, par [c]; *Smith v Organization of Foster Families*, 431 US 816). Finally, the statute, in its legislative findings, embodies a legislative preference for return to the natural family or adoption, rather than long-term foster care, for the sake of the child. A court should not substitute its preference for that of the Legislature.

The challenging parties further contend that the statute violates equal protection by presuming that mentally ill parents are unable to care for children, thereby resulting in "no-fault termination" of parental rights. However, as previously discussed, the statute does not characterize all mentally ill parents as unable to care for their children; rather, it provides a careful test for ascertaining whether a particular parent's mental illness renders him unable to care or plan for the child. The statute, by focusing on conduct, does not create an irrebuttable presumption of parental incapacity to care or plan for their children.

The challengers assert that the statute places an unfair burden on them by denying them the agency's diligent efforts, as provided for in the neglect statute. However, in every instance the agency must make diligent efforts to strengthen the family relationship from the moment the child is placed. A separate showing of diligence with mentally ill parents would serve no purpose, as those mentally ill parents falling within the statutory definition would still not be able to care or plan for their children, notwithstanding agency efforts.

The statute's failure to provide for a separate dispositional hearing, as it does in the neglect statute, does not violate equal protection, as it is based on reasonable differences between the two situations. As the Attorney-General points out, there is a different scope of proof at a neglect fact-finding hearing than at a mental illness hearing. Once permanent neglect is determined, the dispositional phase allows the parent an opportunity to conform to established standards of parental conduct so as to prove fitness to care

for his children in the foreseeable future. In connection with the termination of parental rights on the ground of mental illness, the court must find that the parent is presently and for the foreseeable future unable to care for the child because of mental illness. In this situation, the impossibility of the child's return to the natural family is already decided once a finding of such mental illness is made, and a separate dispositional hearing is not required. (Similarly, a separate dispositional hearing is not provided for parents found guilty of abandoning their children.)

None of the provisions of the statute unreasonably treat mentally ill parents differently from other parents, and the statute meets constitutional equal protection standards.

■ ■ (3) The statute's challengers claim that the statute violates procedural due process guarantees by failing to provide for a separate dispositional hearing, and by allegedly requiring automatic termination whenever a parent is found mentally ill. Procedural due process is applied flexibly, and calls for procedures appropriate to the situation. The court must examine:

A. The private interests affected; and

B. The risk of erroneous deprivation and the probable value of additional safeguards; and

C. The governmental interest.

*(Smith v Organization of Foster Families*, 431 US 816, *supra.)*

The private and governmental interests have been previously discussed in the section on equal protection. The statute does not run the risk of erroneously depriving a parent of his child, as it has a high standard of proof and an exacting test (Social Services Law, § 384-b, subd 3, par [g]; § 384-b, subd 4, par [c]; § 384-b, subd 6, par [a]) that must be met if parental rights are to be terminated. As previously discussed, an additional dispositional hearing would be of little value, as the statute for termination of parental rights on the ground of mental illness provides that the initial fact-finding should encompass those issues of the child's best interests and the parent's ability to care for the child, that are raised at a later dispositional stage in neglect. Finally, the challengers' claim, that the statute

results in automatic termination for mentally ill parents, rests upon an erroneous interpretation of the statute. The statute will terminate parental rights only if the mental illness now or in the foreseeable future renders the parent unable to care or plan for the child *(Matter of Hime Y.,* 52 NY2d 242), and if the termination is in the child's best interests. The statute does not provide automatic termination and does afford mentally ill parents procedural due process.

■ (4) The challengers argue that the statute is unconstitutionally vague. Vagueness is addressed to basic concepts of fairness. In order to avoid a finding of vagueness, a statute must:

A. Provide fair notice of the proscribed behavior; and

B. Set clear enough standards so that the statute will not be enforced in a subjective or arbitrary way; and

C. Not be so overbroad as to result in an inhibition of constitutionally protected activity.

*(Grayned v City of Rockford,* 408 US 104.)

The challengers claim that the statutory terms "foreseeable future", "mental illness", "danger of becoming neglected", and "proper and adequate care", are so devoid of meaning as to render the statute unconstitutional. However, "foreseeable future", although not a precise time limit does set forth a standard commonly understood by medical professionals and laymen. Furthermore, the flexibility of the term offers mentally ill parents greater protection than would a precise time limit because their failure to recover within a precise time limit would cut off their parental rights, despite the real possibility of recovery sometime beyond the time limit.

Second, "mental illness", although subject to varying shades of meaning, is referred to in the statute as a disorder or impairment affecting parental conduct to such an extent that the parent cannot care for the child. Such a definition, by focusing on parental conduct, avoids the possible challenge of imprecision.

Third, the phrase "danger of becoming a neglected child" is explained by reference to the definition of neglect contained in section 384-b (subd 7, par [a]) of the Social

Services Law and section 1012 (subd [f], par [i]) of the Family Court Act.[6] The phrase "proper and adequate care" also receives its meaning through the statutory definition of neglect, which provides objective unambiguous criteria by which neglect is determined.

■ Therefore, the statute, while sufficiently elastic to protect parental rights, is not so indefinite as to deprive parents of fair notice of the behavior affected. Similarly, the statute sets forth clear enough standards so that enforcement will not be subjective or arbitrary. The statute does not infringe upon constitutionally protected activity by a parent to plan or care for a child. Mentally ill parents are not punished for their mental illness per se, as the challengers assert; rather, only mentally ill parents who cannot care for their children are affected, and the neglect of children is not constitutionally protected activity.

The challengers also maintain that there are alternatives to the statute, in that unhospitalized mentally ill parents are subject to neglect proceedings (Social Services Law, § 384-b, subd 4, par [d]). A finding of neglect may not occur if the parent has been hospitalized for mental illness (Social Services Law, § 384-b, subd 7, par [a]). The mental illness statute provides for those situations where the parent is hospitalized or in and out of hospitals due to mental illness. Since the mental illness statute requires a higher standard of proof than the neglect statute (clear and convincing, as opposed to preponderance of the evidence), the mental illness section accords these mentally ill parents greater protection. Although mentally ill parents can be subject to neglect proceedings, this occurs only if they are not hospitalized or if there is lacking clear and convincing

---

6. Section 1012 (subd [f], par [i]) of the Family Court Act defines a neglected child as one whose physical, mental or emotional condition has been impaired or is in imminent danger of being impaired as a result of his parents failing to exercise a minimum degree of care:

"(A) in supplying the child with adequate food, clothing, shelter or education * * * or medical, dental, optometrical or surgical care * * *

"(B) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, including the infliction of excessive corporal punishment; or by using a drug or drugs; or by using alcoholic beverages to the extent that he loses self-control of his actions".

evidence that they will not be able to care for their children in the foreseeable future *(Matter of Hime Y., supra)*. Hence, section 384-b (subd 4, par [c]) and 384-b (subd 4, par [d]) are not duplicative, and the provisions for termination of parental rights for mental illness are not unconstitutionally vague.

(5) Finally, the challengers claim that the statute violates substantive due process by penalizing status rather than conduct, and because it requires automatic termination in every case. However, as previously discussed, it does not penalize a parent's mentally ill status. Rather, it terminates a mentally ill parent's parental rights only when the illness renders the parent unable to provide a child with the minimum requirements of care. This test focuses on a parent's conduct or ability to engage in certain conduct, and does not penalize a parent for being mentally ill. Indeed, some mentally ill parents have been found fit to care for their children *(Matter of Jewish Child Care Assn. [Faye K.]*, 73 AD2d 933). Second, the statute does not require automatic termination, as previously discussed. Only when a parent is found, by reason of mental illness, unable to discharge his duty of care and planning for his child, can his parental rights be terminated. Therefore, the statute does not violate substantive due process standards, as there is a compelling State interest in seeing that children are permanently placed with qualified persons who could perform the parental function of care and planning for the child, and the statute is drawn as narrowly as possible to effectuate that purpose *(Alsager v District Ct. of Polk County*, 406 F Supp 10).

Accordingly, section 384-b (subd 4, par [c]) and 384-b (subd 6, par [a]) of the Social Services Law are not unconstitutional.

### CONCLUSION

In the case of *Matter of Sylvia M.* (104 Misc 2d 357, *supra)* the psychiatric testimony not only supports the conclusion that Manuela is mentally ill, but the evidence considered *in toto* supports the conclusion that she will continue to be mentally ill. No evidence to support a contrary conclusion appears in the record. We agree with Judge FOGARTY

that there was clear and convincing proof of mental illness which renders Manuela unable to provide adequate supervision and guidance to the children in the foreseeable future.

■ We disagree, however, with the action taken by Judge FOGARTY at the close of the dispositional hearing (evidently prompted by his view that the statute was unconstitutional) that the placement of the children be extended for one year. We are of the opinion that the parental rights of Manuela should be terminated.

In the case of *Matter of Nereida S. (supra)* the question of termination of parental rights of the father is more difficult. In the hearing before Judge POLLARD there was psychiatric testimony which, to some extent, appears contradictory. Despite some improvement by Samuel, Dr. Schuster, who examined Samuel, did not believe his mental condition would improve in the foreseeable future. This conclusion was supported by testimony of Dr. Schoelly based upon her examination of Samuel in 1979, whose diagnosis was that of a chronic, undifferentiated schizophrenic, suffering from a basic thinking disorder with little hope for a cure in the foreseeable future. Dr. Schoelly concluded that in these circumstances the children would be in danger of being emotionally and physically neglected, that Samuel was unable to care for them, and that this situation would persist for the foreseeable future. However, Dr. Smith, whose sole meeting with Samuel occurred only minutes before he testified, opined that people with schizophrenic episodes lasting from six months to one year could recover in some cases so as to lead a structured life. Dr. Smith doubted that there could be "a clear and convincing diagnosis" sufficient to make a long-term prediction.

As we have noted, Judge POLLARD found the evidence insufficient to support a finding that Samuel would be unable to care for the children in the foreseeable future. Although he declined to terminate Samuel's parental rights, Judge POLLARD remanded the children to the Commissioner of Social Services for an appropriate disposition.

Proof of past and present mental illness is insufficient to support a finding that a parent will be unable to care for a child in the future by reason of mental illness, where there

is reliable expert testimony that he will be able to do so *(Matter of Hime Y.,* 52 NY2d 242, *supra).*

In our opinion, there was no such expert testimony in reference to Samuel. The testimony of Dr. Smith, to which Judge POLLARD accorded great weight, has no probative value. It was not based upon any comprehensive mental examination of Samuel or a review of his medical history; rather the testimony represented an abstract discussion as to the nature of schizophrenia, its diagnosis and possible cure. Nor does the record show that Dr. Smith was aware that Samuel pleaded guilty in 1978 to the crime of criminally negligent homicide in connection with the death of one of his children and the manner in which the child lost her life. (See n 2, *supra.)*

■ We are of the view, based on the record, that there is clear and convincing proof that Samuel is presently and for the foreseeable future unable, by reason of mental illness, to provide adequate and proper care for Nereida S. and Cecilia L. The parental rights of Samuel should be terminated.

Order of Family Court, New York County (FOGARTY, J.), entered May 15, 1980, which dismissed petition of Cardinal McCloskey School and Home for an order pursuant to section 384-b (subd 4, par [c]) and 384-b (subd 6, par [a]) of the Social Services Law terminating the parental rights of respondent Manuela M. as to her children, Sylvia M. and Alicia M., on the ground, *inter alia,* of respondent's mental illness, should be modified on the law, to the extent of reversing that part of the order which found said sections of the Social Services Law unconstitutional and substituting therefor a finding that those sections are constitutional, and the order should be otherwise affirmed, without costs. The parental rights of Manuela M. should be terminated.

Order of Family Court, Bronx County (POLLARD, J.), entered November 15, 1979, which dismissed petition of Cardinal McCloskey School and Home for an order pursuant to section 384-b (subd 4, par [c]) and 384-b (subd 6, par [a]) of the Social Services Law terminating the parental rights of respondent Samuel L. as to his children, Nereida S. and Cecilia L., on the ground of respondent's

mental illness, should be modified on the law and the facts, to the extent of reversing that part of the order which found there was insufficient proof of respondent's mental illness and substituting therefor a finding that there is clear and convincing proof of mental illness and terminating his parental rights, and the order should be otherwise affirmed, without costs.

FEIN, J. (concurring). I concur in result.

The facts are fairly stated in Justice BIRNS' comprehensive opinion.

In my view the evidence is sufficient for a finding that the children involved in both cases are "permanently neglected" by reason of their parents' failure to plan for the children's future (Social Services Law, § 384-b, subd 4, par [d]; § 384-b, subd 7, par [a]; *Matter of Orlando F.*, 40 NY2d 103; *Matter of Ikem B.*, 73 AD2d 359). In the absence of such proof of permanent neglect I would vote to reverse and remand because I do not agree that there was clear and convincing proof that the parent or parents "are presently and for the foreseeable future unable, by reason of mental illness * * * to provide proper and adequate care" (Social Services Law, § 384-b, subd 4, par [c]). Accordingly, I find it unnecessary to reach the constitutional issue as to section 384-b (subd 4, par [c]) of the Social Services Law.

The evidence in both cases is largely indistinguishable from the evidence found to be insufficient in *Matter of Hime Y.* (52 NY2d 242). As in *Matter of Hime Y.*, there can be no doubt as to the sufficiency of the evidence to support a finding of present inability of the parents, by reason of mental illness, to care for their children. However, with respect to the prospect "for the foreseeable future", the evidence is insufficient. As noted in *Matter of Hime Y.*, the language of the statute is not specific with respect to the scope of the requisite psychiatric testimony. Obviously, to the extent that the expert's testimony relates only to the present existence of mental illness it stands on a firmer footing. However, even in this respect we cannot be unmindful of disputes among psychiatrists and in the psychiatric literature concerning the appropriateness of diagnosing schizophrenia in particular cases. Moreover, the difficulty with the statute and with the testimony here, as in *Matter*

*of Hime Y.*, is in the extent to which the psychiatric testimony addresses the consequences of the mental illness, i.e., the inability at the time of the hearing and for the foreseeable future to provide adequate care for the child.

As stated in *Matter of Hime Y.* (52 NY2d, at p 248): "It may be argued that whether the mental illness is such as to render the mother unable presently and for the foreseeable future to care for her child is a proper subject for expert testimony. In any event an expression of opinion with respect thereto by the court-appointed, examining psychiatrist would augment the evidence on which the court ultimately must reach its conclusion whether the issuance of an order pursuant to section 384-b is warranted." In my view the testimony in both cases is as equivocal as it was in *Matter of Hime Y.* This deficiency is particularly true with respect to the psychiatric testimony as to Samuel L., the father of Nereida S. and Cecelia L. Although it is patent that his history, particularly with respect to the death of his infant child Gloria, noted in footnote 2 of Justice BIRNS' opinion, demonstrates the dangers militating against restoring custody to him, that is not now the issue before us. As to him there was a dispute among the psychiatrists as to whether in the foreseeable future he would be able to provide adequate supervision and guidance to the children. Both with respect to him and with respect to Manuela M., the mother of Sylvia M. and Alicia M., the majority rests on a dubious evidentiary foundation, part of which inheres in the very nature of psychiatric testimony involving predictions, as noted in *Matter of Hime Y.*

I am not unmindful of the fact that Judge FOGARTY found, with respect to Manuela M., that she would be unable to provide adequate supervision and guidance to the children in the foreseeable future. But as I read his opinion, this conclusion appears to rest upon the finding that she was unable presently to provide proper and adequate care because she is mentally ill and will be for the foreseeable future *(Matter of Sylvia M.*, 104 Misc 2d 357, 361). It appears that he so concluded because he felt such result was mandated by the statute which he proceeded to find unconstitutional upon this very ground. As noted in Judge FOGARTY's opinion (p 358), the statute may be read or applied as equating inability "to

provide proper and adequate care" with the mere existence of the mental illness found to be present at the time of the hearing, thus visiting the consequences of loss of parental rights upon a parent suffering from a mental illness merely by reason of status. To the extent that the statute may be so read or applied, I concur with Judge FOGARTY that it is unconstitutional.

Justice BIRNS' careful and thoughtful opinion makes a strong case for the majority that the statute need not be so read and in these cases was not so applied. Although the facts in these cases are strong, I cannot subscribe to that conclusion.

The problem of dealing with and assessing psychiatric testimony under the statute is demonstrated in *Matter of Daniel A. D.* (49 NY2d 788, 790) where the Court of Appeals, noting that the constitutionality of the statute was not there challenged, remanded the case on the ground that the conflict in psychiatric testimony rendered it improper to conclude that the parent there involved was " 'presently and for the foreseeable future unable to provide proper and adequate care' " for the child there involved, " 'by reason of mental illness' ".

In my view, we need not and should not reach the constitutional issue on the familiar principle that if a case can be decided without reaching the constitutional issue, the court should do so. On this basis I prefer to rest my concurrence on what I find to be the clear conclusion from the evidence that these children are "permanently neglected" by reason of their parents' failure to plan for the children's future.

I am not unaware of the fact that with respect to Samuel L. there is a difficulty in finding a failure to plan because of the several years he has been hospitalized (Social Services Law, § 384-b, subd 7, par [d], cls [ii], [iii]). However, I believe there was sufficient time, exclusive of hospitalization, to support a finding of failure to plan. Moreover, as noted in *Matter of Hime Y. (supra)* the statutory definition of a permanently neglected child does not refer to "mental illness" of the parent. The statutory qualifications are that the parent be "physically and financially" able to plan. This

does not encompass mental condition or status.

As stated in *Matter of Hime Y.* (52 NY2d, at p 251): "[M]ental illness does not, *ipso facto*, establish physical disability exonerating a parent from the obligation to plan for her child."

It is equally true that mental illness should not *ipso facto* require a conclusion that the parents are presently and for the foreseeable future unable to provide proper and adequate care for the child. The statute so read or applied amounts to a no-fault and automatic termination of parental rights by reason of status. In my view such a statute is unconstitutional.

We balance here our obligation to apply the least restrictive alternative with respect to interfering with the rights of parents who suffer from a mental illness with our obligation to insure that our determination gives proper consideration to the "best interests of the child", which is his or her right *(Matter of Bennett v Jeffreys*, 40 NY2d 543).

In this light I believe a finding of permanent neglect is warranted.

MURPHY, P. J., SANDLER and BLOOM, JJ., concur with BIRNS, J.; FEIN, J., concurs in an opinion.

Orders, Family Court of the State of New York, New York County, entered on May 15, 1980, unanimously modified, on the law, to the extent of reversing that part of the orders which found certain sections of the Social Services Law unconstitutional and substituting therefore a finding that those sections are constitutional, and the orders are otherwise affirmed, without costs and without disbursements. The parental rights of Manuela M. are terminated.

Orders, Family Court of the State of New York, Bronx County, entered on November 15, 1979, unanimously modified, on the law and the facts, to the extent of reversing that part of the orders which found there was insufficient proof of respondent's mental illness and substituting therefore a finding that there is clear and convincing proof of mental illness and terminating parental rights, and the orders are otherwise affirmed, without costs and without disbursements.