OPINION OF THE COURT
Kathryn McDonald, J.
St. Christopher’s Home (the agency) petitions the court to transfer custody and guardianship of three children born to Marie M. (respondent) on the grounds of her inability to provide adequate care for them due to her mental illness and retardation (Social Services Law, § 384-b, subd 4, par [c]), or, alternatively, because she has permanently neglected them (Social Services Law, § 384-b, subd 4, par [d]). *1032 When respondent was first charged with neglect in the summer, 1977, the children were remanded to the agency. Following a finding of neglect on April 4, 1978, and after appropriate investigation and dispositional hearing, the children were placed in foster care for 18 months on July 10,1978. They have remained in care since then, pursuant to annual extension orders of the Brooklyn Family Court.
The court finds on the basis of clear and convincing evidence that respondent is, and will in the foreseeable future continue to be, unable to provide proper and adequate care for her children due to her mental retardation. “Mental retardation” is defined in both the statute (Social Services Law, § 384-b, subd 6, par [b]) and in the diagnostic manual of the American Psychiatric Association (BSM III) as subaverage intellectual functioning that originates before maturity and results in deficient or impaired adaptive behavior. “Adaptive behavior” is in turn described as the effectiveness with which a person meets the standards of personal independence and social responsibility expected of an individual of her age and cultural group. (BSM III, p 37.) The Social Services Law definition includes the crucial legal element that the impairment of adaptive behavior exists to such an extent that the child would be in danger of becoming a neglected child if placed in the parent’s custody.
It is the inability to provide adequate care, and not retardation per se that establishes the statutory ground for termination of parental rights. (Matter of Sylvia M., 82 AD2d 217.) That judgment is primarily a legal one, supported by the expert psychiatric and psychological evidence required on the issue of mental retardation and by social work history and evaluations. (Social Services Law, § 384-b, subd 6, par [e]; Matter of Hime Y., 52 NY2d 242, 248.) On the question of retardation, the court received testimony and/or reports from seven mental health experts whose examinations of respondent were performed over roughly a three-year period (spring, 1978 to spring, 1981). Six of the seven concluded that respondent is retarded as defined, their diagnoses varying only as to degree: “mildly retarded”, “moderately retarded”, “borderline retarded”, etc. Respondent was repeatedly described by these experts *1033 as “childlike”, “infantile”, and dependent on others for her own daily supervision, care, and guidance.
On a practical level, respondent’s mental limitation was seen by the experts as manifesting itself variously through confusion as to her own age and the names and ages of her children, failure to understand that her children were in foster care and therefore not free to go home with her, and inability to cope with her own daily living arrangements. Respondent’s general store of knowledge is described as poor, her judgment questionable, and her insight into her own difficulties and the causes of her children’s placement virtually nonexistent.
As to the future, the Mental Health Services (MHS) psychologist, Dr. Nussbaum, was firm in his view that respondent’s current level of functioning at the mildly retarded level is chronic and that „ there is no indication that it will not continue in the foreseeable future. The prognosis of Dr. Jospitre, the court-appointed psychiatrist, was not so decisive. He testified that, although respondent was not presently capable of caring for herself or the children unassisted, there was “some chance” of an improvement in the future. Dr. Jospitre declined to label it “a good chance” or “not a good chance,” stating simply that it is a difficult thing to predict.
The court as trier of fact must consider the differing expert opinions and reach its own conclusions based on the full weight of evidence. The court well appreciates Dr. Jospitre’s professional reluctance to give a firm answer to so difficult a question as future improvement. It is noteworthy that Dr. Nussbaum’s more specific prognosis was based, not only on his own interview and test results, but also on respondent’s history, including MHS evaluations made in 1978 during the course of the earlier neglect proceeding. Dr. Jospitre did not have similar background material available to him when he examined respondent. On the basis of all the evidence, the court concludes that respondent’s inability to provide adequate care for her young children will continue in the foreseeable future.
The cause of action based on mental illness is dismissed. No testimony was elicited to support a diagnosis of mental illness.
*1034 As to permanent neglect, the court is mindful that a parent’s mental impairment is not an automatic bar to a finding of permanent neglect. (Matter of Hime Y., supra.) Respondent’s failure to maintain a substantial relationship with her children or to plan for them during their three years in foster care amounts to permanent neglect (Social Services Law, § 384-b, subd 4, par [d]; Family Ct Act, § 614). Under the circumstances, however, where respondent’s mental retardation and inability to provide adequate care have been clearly proven, no one is served by a finding of permanent neglect. (Cf. Matter of Hime Y., supra.)
The court will deal only briefly with respondent’s challenge to the constitutionality of the statute. (The Attorney-General, who was properly served with notice of the challenge, declined to participate in this proceeding, noting that identical issues were then on appeal; see Matter of Sylvia M., 104 Misc 2d 357, mod 82 AD2d 217, supra.) This court is bound by the recent appellate ruling upholding the statute.
Distinctive issues were raised in Matter of Enid R. (Family Ct, Monroe County, 1980, Rosenbloom, J.). This court respectfully disagrees with the conclusion in that case that section 384-b of the Social Services Law is in violation of Federal law and therefore of the supremacy clause of the Constitution. (US Const, art VI.) The Federal law presented in Enid R. was the Rehabilitation Act of 1973 (87 US Stat 355) found in chapter 16 of title 29 of the United States Code: “Labor: Vocational Rehabilitation and Other Rehabilitation Services”. The relevant regulations are contained in title 45 (Public Welfare) of the Code of Federal Regulations. A review of the legislative intent and, indeed, of the statutory language itself, makes it clear that the scope of Federal concern was access by handicapped persons to educational, social, and vocational services that would assure them of “vocational rehabilitation and independent living.” (US Code, tit 29, § 701.) The emphasis of the law and regulations is on nondiscrimination in employment and education. To restrict the analysis of Federal statutes to the Rehabilitation Act is to ignore more relevant Congressional enactments such as the *1035 Adoption Assistance and Child Welfare Act of 1980 (PL 96-272, 94 US Stat 500). That law, with its creation of a new part E (Federal Payments for Foster Care and Adoption Assistance) of title 4 of the Social Security Act (49 US Stat 620) is more closely analogous to section 384-b of the Social Services Law in its concerns for balancing the rights of children in foster care and their natural parents’ rights. This court does not consider either the State’s Social Services Law or the Federal Adoption Assistance Act in conflict with the Rehabilitation Act. The concerns, programs, and standards are distinct, the chief difference being the latter’s emphasis on the handicapped individual’s self-sufficiency in contrast to the needs of children in foster care for permanent homes, whether with their biological or adoptive parents. Respondent’s constitutional challenge is therefore rejected in its entirety.
Although a separate dispositional hearing is not required by the statute, consideration of the child’s best interests is a crucial element in a decision to transfer custody and guardianship to a child-care agency. (See Matter of Sylvia M., supra; Matter of Daniel A. D., 106 Misc 2d 370.) In some cases, a separate hearing is necessary to provide an opportunity for a complete exploration of the individual child’s needs, and the court may, in its discretion, hold such a hearing. (Matter of Daniel A. D., supra.) Although the evidence presented clearly and convincingly establishes respondent’s present and future inability to care for her three children, the court must inform itself fully of each child’s needs and options, in order to determine whether the petitioning agency’s plans for them meet with their interests. In this case, in which the petitions alleged three separate and complex causes of action (mental illness, mental retardation, and permanent neglect), the court-requested completion of the presentation of those causes of action before receiving evidence concerning each child’s circumstances. Accordingly a hearing as to the best interests of Eva, Richard, and Jean M. will be held in Part 2 on August 31, 1981.