OPINION OF THE COURT
Kaye, J.
Where a child has been in the care of an authorized agency for more than a year prior to a petition to commit guardianship and custody to the agency, and where by clear and convincing evidence the child’s parents are shown to be presently and for the foreseeable future unable, by reason of mental retardation, *42 to provide proper and adequate care for the child, there is no per se requirement of a separate dispositional hearing for consideration of long-term foster care. We therefore affirm the order of the Appellate Division, which itself affirmed the termination of appellants’ parental rights.
I
Appellants are the parents of two children, Christopher (born Mar. 1, 1976) and Joyce (born Dec. 21, 1978). Only the younger child, Joyce, is the subject of this appeal.
As a consequence of neglect petitions filed on their behalf, both children have for a substantial period of time lived away from appellants, under the care of the Department of Social Services (DSS) — Joyce since February 2, 1979, when she was six weeks old, and Christopher since March 8, 1980, when he was four years old. On August 29, 1980, after a dispositional hearing on the neglect petitions, Family Court directed that both children be placed with DSS, for foster home placement, for an initial period of 18 months, and that intensive services be provided by DSS to the family, both to attempt to continue the family relationship and to determine if a family unit could be established.[1] Perceiving in this instance a fundamental conflict, the court asked: “Should the rights of children for growth and development outweigh and take precedence over the rights of the parents for custody control?” While the court noted that both appellants were mildly retarded, the basis for the finding of neglect was not their retardation but their “maladaptive behavior.” Appellants appeared eager to love and care for their children, but had insufficient strengths to provide for them, and their conscious resistance to training and “incorrect priorities,” in the view of Family Court, established that the children would be damaged physically, emotionally and in their identity if they remained with their parents.
Both children have ever since resided, separately, in foster care. For several years, each of them has lived in the home of foster parents who apparently wish to adopt them. Appellants have visited their children regularly throughout these years, usually twice a week.
On April 23, 1981, the DSS Commissioner (respondent) petitioned for commitment of the guardianship and custody of the children pursuant to section 384-b of the Social Services Law, *43 alleging that, owing to the mental retardation of the parents, the best interests of the children would thereby be promoted in that they would be in danger of becoming neglected if placed in or returned to appellants’ custody. Family Court after trial in June 1982 granted the petition.
Ten witnesses testified at the trial, including a court-appointed physician and psychologist, after which the court concluded that, though they were loving, caring and desirous of parenting their children, appellants were simply incapable of doing so. The court found that their condition of mental retardation, in the range of mild to mild-severe, originated in organic damage during the developmental period, and despite “tremendous assistance” from the community and the State in becoming independent and developing child-rearing capacities, appellants continued to suffer from an “impairment of an adaptive behavior.” “While [keeping the floor clean] may be taught and [appellants] actually performed said tasks of removal of dangerous objects from the floor, once left alone [appellants] will permit the condition to exist. Indeed, [appellants] have no ability to plan if any change occurs, even if it is expected by virtue of the fact that independent judgment is lacking and in some instances does not exist. Because of the lack of such concrete response, [appellants] are unable to meet their children’s nutritional, physical and educational needs, which is directly related to their developmental disabilities.” The court mentioned particularly, as support for its finding that appellants would not for the foreseeable future be able to parent their children, the testimony of the pediatrician who had attended the children from birth and expressed the opinion that appellants’ inability would persist for an indeterminate term, which could be up to 20 years.
Family Court found that no dispositional hearing was necessary, since it was “clearly and absolutely convinced that [appellants] will not be able at any time in the future to effectively, safely, or in any conceivable manner parent the children; and, accordingly, a dispositional order would be a redundancy.” While the court acknowledged that full-time support services would assist appellants in parenting their children, it rejected this alternative because, given appellants’ inability, the auxiliary homemakers would become the surrogate parents. Concluding that “[t]his Court must look to the future of these children”, it terminated appellants’ parental rights under section 384-b of the Social Services Law and placed both children with respondent for adoption, with a direction that respondent within seven months file appropriate petitions for court review of the adoptive status of the children.
*44 The Appellate Division modified the Family Court order. While agreeing both (1) that there was clear and convincing evidence to support the finding of mental retardation and inability to provide proper care for the children for the foreseeable future, and (2) that section 384-b (4) of the Social Services Law is not unconstitutional, the court differed on the issue of long-term foster care. The appellate court held that Family Court had erred by refusing to consider long-term foster care as an alternative to termination. Whereas Family Court had concentrated on the status of the parents, the Appellate Division concluded that “termination of parental rights is not warranted, and certainly not mandated, if such is not in the child’s best interests, even though the statutory requirements for termination have been established.” In view of evidence of bonding between Christopher and his parents, the court found error in the exclusion of testimony that Christopher’s best interests might be better served by long-term foster care than by terminating appellants’ parental rights, and it remitted the case to permit additional evidence to determine whether Christopher’s best interests would be served by long-term foster care rather than parental termination. The order with respect to Christopher being nonfinal, this court dismissed appellants’ motion for leave to appeal (63 NY2d 603). As to Joyce, however, the Appellate Division accepted the conclusion of the Law Guardian, which it found supported by the record, that there was insufficient bonding to warrant further consideration; this portion of the order being final, we granted leave to appeal (63 NY2d 601).
Three issues are presented: (1) whether there was clear and convincing proof that appellants were presently and for the foreseeable future unable, by reason of mental retardation, to care for Joyce; (2) whether the court correctly refused to reach the issue of long-term foster care; and (3) whether the statute so construed is constitutional. All three questions we answer in the affirmative.
II
Family Court concluded that there was clear and convincing evidence establishing that both appellants were of subaverage intellectual functioning, which originated during their developmental period, that they were so impaired in their adaptive behavior that the children if returned to their custody would be in danger of becoming neglected children as defined in the Family Court Act, and that their inability effectively, safely or in any conceivable manner to parent the children existed not only for the present but also for the indefinite, foreseeable *45 future. The Appellate Division affirmed that these facts had been established by clear and convincing evidence. While there must be “strict adherence to [the] statutory mandate” (Matter of Daniel A. D., 49 NY2d 788, 790), we cannot conclude that there was no evidence in the record to support these affirmed findings (Humphrey v State of New York, 60 NY2d 742, 743-744; Matter of Hofbauer, 47 NY2d 648, 654).
Both court-appointed doctors who had examined appellants gave testimony as to their physical and mental condition and its origins, and expressed the opinion that their mental retardation was an enduring condition. The psychologist, in addition — in support of his conclusion that the children would be at high physical and psychological risk in appellants’ care, a risk that would continue and escalate, despite assistance, as the children matured — testified that appellants lacked the ability to anticipate, plan, organize and deal with change; he saw no progress in the year between the examinations he had conducted. Similarly, the children’s pediatrician, who had seen each child more than 50 times and appellants with them perhaps 20 times over a five-year period, expressed the opinion that appellants were not adaptive and had extremely limited parenting abilities. While the doctor had in 1979 testified that with a homemaker, public health nurse and other support services, appellants could parent their children, he came to believe that they could not, that the full-time resident help they would require would actually provide the parenting, and that appellants’ inability would persist for the foreseeable future — possibly up to 20 years. The foster care caseworker, who visited appellants’ home more than two dozen times during 1979, 1980 and 1981, and observed them with their children, related specific incidents of appellants’ inability to tend to the physical safety and upbringing of the children. The foster parents gave their observations of appellants and appellants’ relationship with the children during visits.
Appellants urge that there was no recent contact supporting the conclusions, and that there was contrary evidence that they had made progress in their ability to groom themselves, care for their home, and seek help from others when needed. While a brief examination long prior to the hearing and a prognosis based on a medical history, with no articulated basis for the testimony concerning the extent of the illness or its manifestations, would not support the termination of parental rights (see, Matter of Dochingozi B., 57 NY2d 641; and Matter of Daniel A.D., 49 NY2d 788, 790, supra), such was hardly the case here.
*46 The particularized testimony from medical and lay witnesses who had known, examined and worked with appellants over a long period, supporting their conclusions as to appellants’ retardation and inability to parent for the foreseeable future, with no countervailing psychiatric, psychological or medical evidence of appellants’ alleged recent progress (Social Services Law § 384-b [6] [e]), constitutes clear and convincing proof of the statutory requisites (Matter of Nereida S., 57 NY2d 636). There is no basis for disturbing the factual findings below.
Ill
Given these factual determinations, we next consider what disposition is to be made. This question is narrowed and focused by appellants’ contention that the error below was in the court’s failure to remit the case for a consideration of whether long-term foster care would serve Joyce’s best interests. The issue is not whether parental rights should be terminated because prospective parents may be more intelligent, or affluent, or “better” parents. Nor is there any question of fault on the part of appellants, or penalizing them for their inabilities. The issue is what disposition is to be made in the best interests of the child where the natural parents cannot, for now and the foreseeable future, care for her.
We agree with Family Court that, on this record, a separate dispositional hearing for consideration of long-term foster care was not required. This is not to say that in other situations it would be error for a court in its discretion to order a dispositional hearing in cases of termination based on mental retardation (see, e.g., Matter of N. Children, 107 Misc 2d 763; Matter of Daniel A.D., 106 Misc 2d 370 [upon remand 49 NY2d 788, supra]; see also, Carrieri, Practice Commentaries, McKinney’s Consolidated Laws of NY, Book 52A, Social Services Law § 384-fa, p 141). But given a record convincingly establishing appellants’ present and future inability to care for the child, despite extensive help, and given the child’s long absence from the home and long residence with foster parents apparently wishing to adopt her, we agree with Family Court that a dispositional hearing for consideration of long-term foster care would be a “redundancy,” that is not mandated by statute, and that the best interests of the child are served by freeing her for the permanence and stability of adoption.[2]
*47 In section 384-b, added to the Social Services Law in 1976, the Legislature brought together the various provisions governing termination of parental rights, and gave the Department of Social Services responsibility for supervision of termination proceedings. This legislation, representing the culmination of a year’s intensive research by the Temporary State Commission of Child Welfare (see, “Barriers to the Freeing of Children for Adoption” [1976 Report]), attempts to balance the interests of all concerned parties — the child, the parents and the State.
In section 384-b, the Legislature has placed primacy on the child remaining with the natural parent, because it found both that the child’s needs are usually best met in the natural home and that parents are generally entitled to bring up their own children. The State’s first obligation is to help the family stay together (Social Services Law § 384-b [1] [a] [ii], [iii]). But permanence in a child’s life also has been given a priority, because the Legislature has determined that a normal family life in a permanent home offers the best opportunity for a child to develop and thrive. Providing a fair and timely basis to free a child for adoption is a principal purpose of the statute. When it is clear that natural parents cannot offer a normal home for a child, and “continued foster care” is not an appropriate plan, the statute directs that a permanent home be sought (Social Services Law § 384-b [1] [a] [i], [iv]).
By reference to “continued foster care” the Legislature in section 384-b clearly did not contemplate foster care as a permanent condition, or even a desired goal for the long, indefinite duration, because prolonged foster care is not in a child’s best interests.* *[3] The Legislature found that unnecessarily protracted *48 stays in foster care deprive children of positive, nurturing family relationships, and therefore — by section 384-b — it provided timely procedures for termination of parental rights, thus furthering the best interests, needs and rights of the child by freeing the child for adoption. In connection with parental termination, in this State, foster care is viewed as a temporary way station to adoption or return to the natural parents, not the purposeful objective for a permanent way of life.
One of the five grounds specified for termination is that the parents “presently and for the foreseeable future [are] unable, by reason of mental illness or mental retardation, to provide proper and adequate care for a child who has been in the care of an authorized agency for a period of one year immediately prior to the date on which the petition is filed with the court”. (Social Services Law § 384-b [4] [c].)* **[4] The petition cannot be brought until the child has been in agency custody for at least one year. Termination on this basis requires a two-part determination at the fact-finding stage, first of the parents’ condition and capacity, including consideration of measures on the part of the State to maintain the family setting, and second of the anticipated effect for the foreseeable future if the child is returned to their care.
*49 In cases of termination for mental retardation the Legislature has not provided for a separate dispositional hearing — “a hearing to determine what order of disposition should be made in accordance with the best interests of the child” (Family Ct Act § 623) — as it has in cases of termination based on permanent neglect (Social Services Law § 384-b [3] [f]; Family Ct Act §§ 611, 623). While in cases of neglect the separate hearings have been found to serve the beneficial purpose of changing parental attitudes,[5] where parental rights are terminated because of their present and future inability, the possibility of such change by definition does not exist, and further delay and indecision do not serve the child’s best interests. Instead, the best interests of the child are subsumed in the initial fact-finding determination as to whether the child could be returned to its home in the foreseeable future (see, Matter of Nereida S., 57 NY2d, at p 640, supra, affg 82 AD2d 217, 234, 235). This is consistent with the language of the statute (see, Social Services Law § 384-b [1] [b]; [3] [i], [k]), as well as its legislative history (see, 1976 Report, at 4, 36-39), both expressly referring to the necessity for consideration of the best interests of the child.[6] Where the requisite findings are made to support termination of parental rights for mental retardation, prolonged foster care is generally inappropriate because the proof establishes that the child cannot be returned to the care of the natural parents for the foreseeable future.
Unlike cases of abandonment, neglect and abuse, the painful process of severing parental rights on account of their inability to care for a child involves no wrongdoing or fault on their part. As here, parents may love their child, desire to parent her, and make extensive efforts to create a relationship with her. But at the heart of the matter is the fact that the parents have been convincingly shown to be wholly incapable of providing proper and adequate care for the child for the foreseeable future. In this situation the Legislature has determined that, however blame *50 less and loving the parents, the child’s best interests demand that she be freed for a permanent home.
IV
Finally, we reject appellants’ argument that section 384-b (4) (c) of the Social Services Law is unconstitutional because it infringes on the fundamental rights of intellectually limited parents without a justifiable compelling State interest, or even a rational basis.
We find no material distinction from Matter of Nereida S. (57 NY2d 636, supra), where we concluded that there was no violation of the procedural and substantive due process or equal protection in a termination of parental rights based on mental illness. As we held in Nereida, “The statutes provide significant procedural safeguards for the natural parent’s rights and authorize termination of parental rights only when specific and definite criteria are met and when necessary in the best interest of the child. Similarly unpersuasive is the argument that the statutes authorize termination of rights on the basis of a parent’s status as mentally ill. Termination is warranted only when the parent’s mental illness manifests itself in conduct demonstrating a present and future inability to care for the child. It is the parent’s conduct and relationship with the child, not his or her status per se, that forms the predicate for terminating parental rights.” (id., at p 640.)
Accordingly, the order of the Appellate Division should be affirmed, without costs.
Chief Judge Wachtler and Judges Jasen, Meyer, Simons and Alexander concur.
Order affirmed, without costs.

. As the court observed, appellants already had a long history of involvement with more than a dozen local agencies. The court directed continuing child protective and foster care casework services, health services, vocational/ rehabilitation services, and continuing family evaluations.

. On the dispositional question, the issue pressed by appellants is that of long-term foster care, not parental visitation. While appellants also complain that no attention was given to sibling visitation or the sibling relationship, we do not reach the question whether, after termination of parental rights, *47 provision may be made for some continuing tie with Joyce’s biological family, as by visitation in connection with an order of adoption (see, Matter of Anthony, 113 Misc 2d 26; cf. People ex rel. Sibley v Sheppard, 54 NY2d 320). Respondent in his brief indicates that visitation with appellants as well as with Christopher would continue after Joyce’s adoption. (See generally, Davis, Use and Abuse of the Power to Sever Family Bonds, 12 NYU Rev of Law & Social Change 557; Amadio and Deutsh, Open Adoption: Allowing Adopted Children to “Stay in Touch” with Blood Relatives, 22 J Fam Law 59.)

. As stated in the Memorandum of the Temporary State Commission on Child Welfare:
“This bill, introduced at the request of the Temporary State Commission on Child Welfare, is a major product and component of a Title IV-B funded, research and demonstration project, conducted by the Commission for the State Department of Social Services. The purpose of the study entitled ‘Barriers to the Freeing of Children for Adoption’, was to determine why existing statutes relating to termination of parental rights have failed (as evidenced by unconscionable delays in freeing children or, even worse, by failure to free children resulting in many instances of needless and detrimental continuation *48 of children in the limbo of foster care) and to recommend remedial action.
“The bill reflects the Commission’s many statutory recommendations arising from its Study which was based, in large part, on interviews with those responsible for administering or implementing the laws: Family Court judges, surrogates, administrative, supervising and casework staff in public and voluntary child care agencies, and attorneys representing agencies, parents and children. The bill represents, probably for the first time, a comprehensive, unified approach to a complex, highly specialized field and its inherent and systemic problems.
“Public costs for foster care in New York State aggregate more than $270 million on an annual basis, and are expended for nearly 49,000 children. For several thousands of these children whose families cannot be reunited and who, therefore, cannot return to their own homes, foster care has been inappropriately extended for large parts of childhood and adolescence, necessitating consistently high levels of public expenditure, when in fact such children should be legally freed for adoption and placed in adoptive homes.” (1976 New York Legis Ann, “Health and Social Services”, at 239.) “Foster guardianship” has been proposed (see, e.g., S 240, A 7585, 1981 Reg Sess; S 7460, 1978 Reg Sess) but not adopted by the Legislature.

. An increasing concern for the interests of the child and the child’s right to a normal, permanent family life may be seen in the expansion of grounds for termination of parental rights (1976 Report, at 10-14; see also, Matter of Bennett v Jeffreys, 40 NY2d 543, 546). While abandonment prior to 1959 was the major ground for parental termination, strict judicial interpretation of the concept of “abandonment” led to the adoption of a permanent neglect standard in 1959; mental illness was added in 1973, mental retardation in 1975, and abuse in 1981 (L 1981, ch 739).

. “[T]he majority of Family Court judges preferred that the dispositional hearing be retained, indicating that during the hiatus between the two hearings, parental attitudes and behavior may change — often as a result of the impact or shock of the fact-finding hearing itself.” (1976 Report, at 28.)

. Appellants point to the fact that Family Court insisted that the proof at trial be limited to the status of the parents, and excluded evidence (most often tendered by respondent) regarding the mental, physical and emotional health of both children. While the statute necessarily encompasses the best interests of the child as part of the fact-finding determination, on this record — particularly given the affirmed findings and the fact that the alleged error consists of a failure to consider long-term foster care — we cannot say that the exclusion of such evidence here constituted reversible error.