OPINION OF THE COURT
Claire T. Pearce, J.
The authorized agency, Little Flower Children’s Services, hereinafter the agency, moves for an order terminating the parental rights of the respondent mother as to Tashien, born May 29, 1996, and Patrick, born December 12, 1994, based upon respondent’s alleged inability to presently and for the foreseeable future adequately care for her children due to her mental incapacity.
Facts
On the motion of the agency, and without objection, the court took judicial notice of all petitions, findings of fact and orders *260 of disposition against the respondent. No finding of acts or omissions resulting in injury, neglect or abuse have ever been made against her. Prior findings are all based on findings of “mental retardation” precluding her ability to function as a parent thereby placing her children at risk of neglect.
The subject children have been in foster care since their birth having been removed immediately due to the prior proceedings had in this court in which the maternal grandmother was alleged to have abused drugs and her refusal to cooperate with services offered for her rehabilitation. Initially the respondent mother and her oldest child resided with the maternal grandmother who was alleged to have exercised control over respondent’s SSI payments and who allegedly took primary care of the child. No facts as to what specific duties the grandmother’s care involved were determined during the initial or subsequent proceedings and no specifics as to the respondent’s functioning as a parent were presented. It is to be noted that the respondent suffers from a speech defect which impedes her ability for clear expression. She is characterized by Dr. N.G. Berrill as having an “expressive speech problem.” (Psychological evaluation by Dr. N.G. Berrill, dated Sept. 8, 1999.) The respondent has never been diagnosed as having a mental illness.
According to the record of this and the prior proceedings all except two of the respondent’s children were fathered as a result of a violent and coercive relationship with one David Raymond. Mr. Raymond was incarcerated in the early 1990’s for a period of several years for stabbing the respondent. Subsequent to his release he was again incarcerated and is presently serving a sentence reputedly on charges of raping the respondent. The respondent mother appeared enthusiastic in her cooperation with his prosecution and frequently expressed to the court her fear of Mr. Raymond and her desire to be effectively protected against him. No indication of the maternal grandmother’s assistance or efforts to protect the respondent from Mr. Raymond were demonstrated. Mr. Raymond’s rights were terminated on April 4, 2000.
In 1993 termination proceedings were established against the respondent mother on the grounds of mental retardation and her rights were terminated based on the evidence adduced and the lack of countervailing evidence presented by the respondent at that time. No evidence at any proceeding has been presented as to the respondent mother’s failure to visit regularly or to cooperate with any plan or any offer of services *261 aimed at her reunification with her children. Agency chronological reports record respondent's visits as very pleasant and productive. She brings small offerings for the children’s consumption. They sit on her lap. She is described as warm, outgoing and concerned. Nevertheless, there is no credible evidence of any referrals of the respondent mother for services, aimed at reunification, by the agency during the entire record of the placements of her children. Additionally, during the present litigation the court sought to have the agency assist the respondent in securing appropriate services through the Office of Mental Retardation and Developmental Disabilities (OMRDD) or its affiliates and was informed periodically of the petitioner’s fitful interest in pursuing the court’s direction and failure on occasion to assist the respondent in becoming engaged in such services.
Apparently because the New York statute Social Services Law § 384-b (4) (c) does not require a showing of “diligent efforts” for reunification in termination eases alleging mental illness or retardation (cf. Social Services Law § 384-b [5]), there is no evidence adduced that the agency ever attempted to independently ascertain the actual level of the respondent’s potential functioning at any time prior to the institution of these proceedings. (See J.T. v Arkansas Dept. of Human Servs., 329 Ark 243, 259, 947 SW2d 761, 769 [Thornton, J., dissenting]; City of Cleburne v Cleburne Living Ctr., 473 US 432, 455 [Marshall, J., dissenting].) From the evidence that has been adduced however, it appears that the agency, in planning for the subject children, assumed the respondent's lack of capacity based primarily on her previously reported IQ, and the original outdated reports relied upon by Dr. Katherine Smith in her evaluation of the respondent’s functioning in 1993. The only plan articulated by the petitioner for the return of any of the respondent’s children was for the rehabilitation of the maternal grandmother, who has never expressed an interest or given the slightest indication of cooperation with such a plan. Therefore, on this record it appears that the agency never considered a plan of reuniting the respondent with her children. However, the respondent has continuously expressed her desire and willingness to cooperate with a plan for reunification.
Although she had been described in 1993 as unable to travel alone or to perform minimal tasks in regard to her own care and welfare, she has demonstrated significant progress in all of these areas during this proceeding. She has demonstrated perseverance in the face of persisting rejections and personal *262 adversity, i.e., assault, rape, her mother’s perfidy and the prior termination of her rights as a parent. She has a single-mindedness of purpose and determination seldom seen in "normal” respondents before this court. She can now negotiate the city’s transportation system; she travels to court unaccompanied and is seldom late: The court has observed her ability to very adequately care for her own personal grooming and wardrobe. She can cook and shop for food with assistance in paying the bills. She can write her name but cannot count change, and she expresses a desire to return to school to learn to read and handle money. (Professional Services Centers for the Handicapped [hereinafter P.S.C.H.] Habilitation Clinic diagnostic psychological evaluation, dated Apr. 24,1997.) There is no evidence that she has ever had a problem of substance abuse. She is usually soft spoken and reticent but has demonstrated amply her ability to be assertive and outspoken in her own behalf.
Without any credible evidence of assistance by the petitioner she has attended a sheltered workshop for an extended period of time in the past, and subsequent to the filing of these petitions, she has sought, and with the dedicated help of her attorney, has found services appropriate to meet her needs through the auspices of OMRDD, thereby exhibiting her ability to successfully make critical judgments as to her own best interests and her willingness and capacity to act independently to seek her goal, i.e., the return of her children. It is to be noted that the respondent’s mother, except for one or two occasions, has been absent throughout the entire course of these litigations and has provided no evident assistance to the respondent in her efforts. The P.S.C.H. report, dated April 24, 1997 relates that her sister and grandmother provide some assistance and moral support but appear to be only peripherally involved. The respondent mother has, during this proceeding, demonstrated her ability to recognize her own need for assistance and to take full advantage of appropriate help when offered. The petitioner and the Law Guardian concede that she has shown her ability to learn and has increased her understanding and level of functioning and organization in a varied number of areas after counseling through an OMRDD affiliated agency. She has gained improvements that are critical to successful functioning in society in general and as a parent in particular.
Gradually over the duration of this litigation the court has come to recognize the initiative, independence and resourceful *263 ness of this respondent, which when viewed even from the perspective of her intellectual deficits help to demonstrate her ability and potential for learning to be a responsible parent.
During this proceeding the respondent mother requested the provision of an independent psychological assessment which was ordered without objection. Dr. N.G. Berrill was appointed by the court with the approval of the parties and the Law Guardian. The court therefore had the benefit of three evaluations of the respondent’s capabilities. Dr. Katherine Smith, psychologist, former director of Mental Health Services, Kings County Family Court, during the first proceeding to terminate the respondent’s parental rights, presented a report which heavily relied on prior records which have not been introduced in this proceeding, an office interview and a separate testing session. Dr. Smith reported that the respondent had a verbal IQ of 55 + 5, a performance IQ of 60 + 8, and a full scale IQ of 53 ¿ 5 and determined her to be mentally retarded and opined that respondent was unable to care for her children for the foreseeable future, apparently based upon the aforementioned reports indicating the respondent’s incapacity to adequately care for herself at that time. Dr. Berrill also found the respondent to be mentally retarded, with a verbal IQ of 50, a performance IQ of 58 and a full scale IQ of 50. However, his opinion as to her future ability to parent was more equivocal than Dr. Smith’s and he was quite hesitant to state that the subject children would be neglected if they were in the respondent’s care. He indicated that the respondent would require support and assistance to provide care for her children and based on a written description of Tashien’s special needs Dr. Berrill indicated his belief that the respondent would be unable to provide the necessary care he needs. Neither Dr. Smith nor Dr. Berrill were shown to have any special experience in treating mentally retarded patients and neither showed any expertise or particular knowledge of the treatment or community resources of OMRDD and its affiliates. Dr. Berrill also opined without objection that the respondent has a meaningful relationship with the subject children and that it would not be in their best interest to curtail their contact with the respondent mother.
Finally, in this proceeding the respondent presented a vigorous defense and offered Dr. Elzbieta Tracewicz, a psychotherapist who received her PhD from the Catholic University of Lublin in Poland in 1982, as an expert witness on her behalf. Dr. Tracewicz is not a licensed psychologist in the State of New *264 York; however, she has practiced for 19 years and she is presently employed by “Synergia” a New York State certified residential program for the habilitation of mentally retarded parents in the capacity of a treating psychologist. (See Education Law § 7605; see J.T. v Arkansas Dept. of Human Servs., supra at 769 [Thorton, J., dissenting].)
Dr. Tracewicz, who has treated the respondent for a significant period of time, testified that the respondent had cooperated fully with treatment; that she disagreed with the assessments of Dr. Smith and Dr. Berrill both as to the respondent’s IQ (she found respondent’s IQ to be “around 63” which is mildly retarded) and she also opined that the respondent is presently capable of caring for her children at “Synergia.” (See Hosier, “Trying to Cure A Seven-Year Itch”: The ADA Defense in Termination of Parental Rights Actions, 37 Brandéis LJ 785, citing Bernstein, Termination of Parental Rights on the Basis of Mental Disability: A Problem in Policy and Interpretation, 22 Pac LJ 1155; J.T. v Arkansas Dept. of Human Servs., supra at 769.) Additionally, Dr. Tracewicz testified that the respondent’s capabilities are comparable to those of other patients in the residential program, which requires that clients have at least one child in their custody, some of whom are also developmentally delayed. (Dayman, Presumptions of Justice: Law, Politics, and the Mentally Retarded Parent, 103 Harv L Rev 1201.)
The petitioner and the Law Guardian requested that the court give Dr. Tracewicz’s testimony diminished weight based on (1) her lack of a New York State license or certification, and (2) her candid statement that she has worked closely with the respondent and has a favorable impression of the respondent’s progress. Regarding the first claim, the procedure for licensure or certification is not material to the rules of evidence as to establishing expertise sufficient to aid the court in arriving at its determinations. (Dougherty v Milliken, 163 NY 527.) In fact, Dr. Tracewicz’s actual work in the field of mental retardation qualifies her more specifically and more credibly as to some of the issues in this case. (Frye v United States, 293 F 1013.)
As to the second claim, Dr. Tracewicz has had specific knowledge of this respondent and her functioning for at least two years’ duration. The court was impressed by what appeared to be the doctor’s professionalism, perceptiveness, her knowledge of the respondent and the needs, resources and treatment modalities for the service population of the mentally retarded. *265 (Hayman, Presumptions of Justice: Law, Politics, and the Mentally Retarded Parent, supra.) There was absolutely no basis to conclude from anything Dr. Tracewicz did or said that she would impugn her own integrity or mislead the court to have the respondent’s stated improvements “reflect favorably on her.” (See Daubert v Merrell Dow Pharms., 509 US 579, 588; Campbell v Metropolitan Prop. & Cas. Ins. Co., 239 F3d 179.)
The opinion of each of the expert witnesses regarding the respondent’s level of intellectual capacity based on an evaluation of her IQ was fairly consistent placing her in the range of 50 to 63 which is mild to moderate retardation. Dr Smith’s evaluation of the respondent’s “adaptive ability”[1] appears to be based upon her review of prior records and her office interview. It is noted that there was “no specific assessment of [the] parental capacity” of respondent in any of those reports. (Clinical report by Dr. Smith submitted in 1993.) Dr. Berrill was able to see the respondent on at least four occasions. The opinions of each of these expert witnesses differed materially only in regard to the respondent’s present ability to adequately parent her children in the foreseeable future. Based on Dr. Tracewicz’s specific in-depth experience the court credited her testimony as to the respondent’s recent progress (which was not addressed by either of the other expert witnesses and was unrebutted by the agency or Law Guardian) and her potential and her present ability with the necessary supports from “Synergia.”
In addition the respondent placed several reports by P.S.C.H. in the record providing more recent diagnosis and evaluations of the respondent’s functioning and a plan for treatment with which the respondent has cooperated. The respondent also produced two other witnesses, Jane Roberman, a social work consultant engaged by the respondent pursuant to section 722-c of the County Law to assist the respondent in finding placement in a community-based program designed to meet her needs. She was instrumental in referrals to OMRDD and “Synergia.” Egbadel Alvarado is the Family Care Director of *266 the “Synergia” Family Care Program who testified that “Synergia” is an accredited program of OMRDD and appropriate for this respondent and her children and that the program was ready to accept the respondent and one child. (Hayman, Presumptions of Justice: Law, Politics, and the Mentally Retarded Parent, supra.)
Discussion
Historically, the mentally disabled have been subjected to discriminatory, often brutal, treatment such as ostracism, imprisonment, burning at the stake, and within more recent memory, forced sterilization (Buck v Bell, 274 US 200) and institutionalization. “Deinstitutionalization” is a relatively recent phenomena and many of its effects have yet to make a full impact on society. One of the effects is the growing number of mentally disabled that have or will exercise their right to procreate (cf. Skinner v Oklahoma, 316 US 535, 541) and their presumed consequent right to parent their progeny when they are able to do so. (See Montanaro, The Americans with Disabilities Act: Will the Court Get the Hint? Congress’ Attempt to Raise the Status of Persons with Disabilities in Equal Protection Cases, 15 Pace L Rev 621; Hayman, Presumption of Justice: Law, Politics, and the Mentally Retarded Parent, 103 Harv L Revl201.) “In 1990 Congress found that over 43,000,000 disabled Americans [including the mentally retarded] faced ‘serious and pervasive’ discrimination without legal recourse in a number of ‘critical areas’ including * * * ‘access to public services.’ In response to such discrimination, Congress unanimously enacted the Americans with Disabilities Act (ADA).” (Hosier, “Trying to Cure a Seven-Year Itch”: The ADA Defense in Termination of Parental Rights Actions, 37 Brandéis LJ 785 [emphasis added]; 42 USC § 12101 [a].)
Although the ADA’s provisions are not directly at issue here, Congress’ findings and statement of purpose in this legislation can serve to further inform the legal community, mental health professionals and social service providers of the growing recognition of the rights of the disabled (i.e., the mentally retarded) and efforts to try to redress past and present inequities. It is noted that under the ADA a “public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements * * * [d]eny a qualified individual with a disability the opportunity to participate in or *267 benefit from the aid, benefit or service * * * or provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others” (28 CFR 35.130 [a], [b] [1] [i], [ii], [iii], [iv]). That “unlike individuals who have experienced discrimination on the basis of race, color, sex, natural origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination; individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion * * * and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities * * * individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond [their] control * * * and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society” (42 USC § 12101 [a] [4], [5], [7] [emphasis added]).
The purpose of the ADA is in pertinent part: “to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.” (42 USC § 12101 [b].) All members of our society, including members of the mental health profession, are heirs to the prejudice, stereotyping and discrimination found by Congress. In keeping with the tenor of the findings and purpose of the ADA, Watkins expresses some powerful and thought-provoking concepts on stereotyping of the mentally retarded which reflect the strong direction of societal advances toward recognition of the need for equality of treatment for persons of “subnormal intellectual abilities.”
“Neither developmental disability nor mental retardation is a disease or a disorder; they are simply descriptive labels and administrative terms ‘used to identify those persons who seem to exhibit subnormal intellectual abilities.’ The only trait shared by persons labeled mentally retarded or developmentally disabled is their inability to perform at a certain level on various measurements *268 of intellectual capacity. The term ‘mental retardation’ in particular, with its roots in the Binet Intelligence Quotient (IQ) test, has been derided as having Tittle scientific integrity and minimal predictive or explanatory potential.’ Nor does the term refer to a fixed level of ability: as new tests and standards have emerged to determine mental retardation or developmental disability, individuals have moved in and out of the class so labeled. The degree to which one is considered impaired may depend on specific measurement used, as well as on the examiner conducting the test. Thus, it is not unusual for an individual to be classified as severely mentally retarded in one examination and mildly retarded in another.
“Currently, there are over 250 known causes of mental retardation or developmental disability, and there are thought to be more unknown than known causes. Persons sharing the label share no common symptomatology. They may exhibit deficits in a variety of perceptual or communicative skills, but the extent and nature of the specific deficit varies from individual to individual. Moreover, intelligence does not remain static; like all persons, individuals labeled mentally retarded or developmentally disabled can learn to improve such things as comprehension and memory. In other words, they can learn how to learn.
“The one thing shared by persons labeled mentally retarded or developmentally disabled is the label itself and the diminished expectations and outright discrimination that so often accompany the label.” (Watkins, Beyond Status: The Americans with Disabilities Act and the Parental Rights of People Labeled Developmentally Disabled or Mentally Retarded, 83 Cal L Rev 1415, 1422-1424 [emphasis added]; citing Hayman.)
In order to fairly and appropriately address the service needs of this population, every mentally retarded person should be entitled to an individualized assessment of his or her capacities and potential ability by specially trained and qualified mental health professionals experienced in treatment and habilitation resources available in the community, in addition to any routine examination and evaluation by a psychologist or *269 psychiatrist with a general practice.[2]
The petitioner in effect contends that Social Services Law § 384-b (4) (c), which makes no provision for a showing of “diligent efforts” in a proceeding to terminate the rights of a parent who is mentally retarded, relieves the authorized agency from a duty and responsibility to provide any services or make any efforts to reunify the mentally disabled person with her family. Therefore, the petitioner here appears to take the position that Social Services Law § 384-b (4) (c) is not only a procedural and evidentiary provision outlining the order and elements of proof required in this proceeding but it is also substantive in that it determines that a “mentally retarded” individual who is deemed by the agency to be unable to care for her children for the foreseeable future is de facto incapable of being a responsible parent making the necessity to even attempt to assist such a person to become capable futile and unnecessary. Consequently, the petitioner placed no evidence before the court outlining the agency’s efforts to assess the individual capabilities of the respondent in regard to her actual functioning as a parent either in her home or the community with a view to developing a plan for reunification with these children, or to provide any services with a view toward reunification. Thus, despite several years of contact, despite the respondent’s continual requests for the return of her children, and the lack of evidence as to having ever failed to cooperate with the agency’s requests, her regular visits and obvious interest, there is no evidence that the agency ever initiated referrals to obtain a fuller understanding of the respondent’s actual capacity, recent or otherwise, not even to a sister agency whose primary purpose is to provide services to the mentally retarded, OMRDD. (Mental Hygiene Law §§ 13.01, 13.07.) Therefore, the court concludes that the agency never considered the reunification of this respondent with her children, and from the evidence that determination was made without any consideration of whether the respondent was an appropriate subject for habilitation, but presumed her incapacity by virtue of her alleged mental status.
If the petitioner’s contention as to the meaning and applicability of Social Services Law § 384-b (4) (c) were accepted as accurately reflecting the intent of the Legislature and a cor *270 rect reading of the determining authorities then all persons of an arbitrarily defined “IQ” (below 90? 80? 70? 60?), who by virtue of inadequate education, training, life experiences and treatment, are unable at any specific point in time, to articulate how they would perform some specific task, related or not to parenting ability, would be forever foreclosed from the society of their children. (Hayman, Presumptions of Justice: Law, Politics, and the Mentally Retarded Parent, supra; cf. Matter of Strausberg, 92 Misc 2d 620, 622 [where a “borderline”[3] parent who had completed the ninth grade and could read and write was determined to be “mentally retarded” and incapable of caring for her children for the foreseeable future in that the parent was judged to be of subaverage intellectual capacity and subaverage social maturity, “to [the] extent that a child in her custody would be unlikely to have a normal family life”] [emphasis added].) However, this determination had an added factor of a diagnosis of “inadequate personality features” which is a personality disorder or mental illness. (See Hayman, Presumptions of Justice: Law, Politics, and the Mentally Retarded Parent, supra at 1214-1218; J.T. v Arkansas Dept. of Human Servs., supra at 769 [Thornton, J., dissenting].)
A reading of Social Services Law § 384-b (4) (c) clearly shows that while the Legislature does not mandate a showing of diligent efforts by the agency, it does not in any way preclude such a showing. The appellate court in determining that the present statutory scheme was constitutional as it applied to the mentally ill made it clear that agencies are not relieved of the responsibility to make diligent efforts to reunify the mentally ill with their children. By analogy the agency has the responsibility to make diligent efforts to unify the mentally retarded also.[4] (Matter of Sylvia M., 82 AD2d 217, affd sub nom. Matter of Nereida S., 37 NY2d 636; see Adoption and Safe Families Act adopted into law in New York State, L 1999, ch 7; *271 Child Welfare Reform Act [1979] providing statutory authority and guidelines mandating authorized agencies to plan for reunification of all natural parents with their children and setting standards and time frames for meeting goals and objectives with no exceptions made for parents who are mentally retarded or mentally ill.)
In Sylvia M. (supra at 233) the appellate court determined that parents who are mentally ill and who are unable to care for their children for the foreseeable future are a discrete “class” within the larger classification of the mentally ill or retarded parents and, theoretically at least, are readily distinguishable from mentally ill or retarded parents who have neglected their children but are not incapable of caring for their children for the foreseeable future. Parents belonging to the latter categories are placed together with all parents of “normal” intellectual capacity and are entitled to all of the rights and privileges granted to such parents, i.e., a showing of diligent efforts, a burden of proof which remains with the petitioner as to every element of the allegations, a separate dispositional hearing and an opportunity for a suspended judgment.[5]
Members of the discretely defined “class” are stated to not be entitled to a showing of diligent efforts by the petitioner because in this analysis proof, by clear and convincing evidence of incapacity due to mental illness or retardation for the foreseeable future, results in the self-evident conclusion that diligent efforts would be unavailing. Given present day views on the potential capacity of the mentally retarded and advancement in provision of psychotropic medication to the mentally ill such a conclusion is rarely self-evident solely on the basis of psychiatric and/or psychological evidence. Failing the “self-evident” showing by clear and convincing evidence, the unadjudicated respondent remains in the category of a mentally retarded parent who is not shown to be incapable of caring for her children for the foreseeable future, and following the analysis of Matter of Sylvia M. (supra), is entitled to be treated in *272 accordance with equal protection and due process requirements in a manner analogous to that granted to all other parents alleged to be permanently neglectful. Therefore, it was the burden of the agency to go forward to show that they made diligent efforts to secure reasonable and appropriate services to advance a plan for reunification of the respondent with her children and the respondent’s failure or inability to cooperate with that plan by clear and convincing evidence.
Moreover, by failing to place evidence of diligent efforts in the record the agency effectively shifted the burden of proof to the respondent to show by a preponderance of the evidence that she is not a member of the defined “class” and that the agency failed to provide services aimed at reunification of her children and that she has had and has the ability to be educated, trained and counseled and hence habilitated and is able to care for her children in the foreseeable future; a burden under the present statutory scheme that is viewed as inappropriate for “normal” respondents. Therefore, prior to a determination of incapacity by clear and convincing evidence, such a shift in the burden of proof for persons alleged to be mentally retarded for the foreseeable future is a denial of equal protection and due process.
Consequently in each prosecution of a termination proceeding based on mental retardation and incapacity for the foreseeable future, the agency must evaluate whether the psychiatric or the psychological evidence standing alone, without proof of diligent efforts, is clear and convincing and decide whether the introduction of such evidence is necessary to prove their case. All of the authorities cited by the Law Guardian and the agency, for the proposition that parental rights of mentally retarded parents are terminated only upon the literal statutory showing by the petitioner, are distinguishable on the facts and almost uniformly reflect actual attempts at reunification and diligent efforts or a showing of some other factor indicative of neglect and/or abuse by the retarded parent with persistent inability or intentional failure to utilize assistance which is not the circumstances of this case.
Introduction into evidence of prior determinations of incapacity is not res judicata as to the issue of present ability and present potential for habilitation. It is only evidence of the court’s previous determinations based on the past facts and circumstances. Such evidence in the face of direct evidence of present capacity cannot support a clear and convincing finding. To interpret the statutory scheme under Social Services Law *273 § 384-b (4) (c) otherwise would render its application unfair and discriminatory as to mentally retarded parents and, under more recent interpretations by the Supreme Court, perhaps incur the risk of a determination of a denial of equal protection and due process even under a rational basis review. (See City of Cleburne v Cleburne Living Ctr., 473 US 432; Watkins, Beyond Status: The Americans with Disabilities Act and the Parental Rights of People Labeled Developmentally Disabled or Mentally Retarded, supra.) The failure of the Legislature to affirmatively mandate a showing of diligent efforts for mentally retarded parents cannot be said to be the result of an intentional attempt to isolate and prejudge such persons, but it would appear that the determination was made in the context of the 1970’s societal awareness and sophistication, or lack of sophistication, and knowledge regarding the true nature of mental retardation and the relatively unknown potential of each individual so labeled.
The question can also be raised as to what legitimate purpose a literal imposition of the statute’s terms serves or advances. The additional time required to place evidence of diligent efforts on the record is negligible within the context of the proceeding itself. Granting to this small segment of the litigants in termination proceedings all of the rights and procedures provided to other neglectful parents is de minimis to the government and is absolutely critical to the future of the respondents and their children. This court urges the Legislature to revisit the statutory provisions as they apply to the mentally retarded and the mentally ill and make clear these respondents’ rights of due process and equal protection.
Additionally, the petitioner and the Law Guardian contend that the respondent has the burden of showing that she can care for her children “independently” and without assistance. (Matter of David Joseph G., 169 AD2d 439; Matter of Tonya Louise M., 91 AD2d 868.) The burden of showing the respondent’s mental retardation and inability to care for her children for the foreseeable future is the burden of the petitioner and not the respondent and this burden must be carried by clear and convincing evidence. (Caban v Mohammad, 441 US 380.) Unless the petitioner or Law Guardian can show by the required quantum of proof that these children would be at risk of neglect if placed in the respondent’s care they cannot prevail. (Matter of Michael B., 80 NY2d 299; Matter of Male Infant L., 61 NY2d 420; Matter of Sanjivini K., 47 NY2d 374; Matter of Corey L v Martin L, 45 NY2d 383.) The fact that the respon *274 dent requires assistance is not proof of her inability unless the assistance required is unavailable or requires unreasonable efforts to supply. It is not irrelevant to note that if the assistance that is proposed was provided by her mother the respondent probably would never have found herself in court in the first instance. In fact neglectful and permanently neglectful parents are provided continuing supports after the return of their children as a matter of course, i.e., continuing drug rehabilitation; continuing psychotropic medication and counseling; maternity shelter; foster care with their children for teenage mothers; respite care for nonneglecting parents of children at risk of neglect; home health aides for the physically disabled; and recurring stints in parenting skills training for all of the above. Adoptive parents are provided continuing assistance in the form of adoption subsidies which are unavailable to natural parents.
The Law Guardian further argues, apparently in view of the statute’s lack of a requirement for a dispositional hearing in the case of the mentally retarded (cf. Social Services Law § 384-b [7] [a]), that the number of years of placement of the subject children and their specific needs should invoke a determination that it would be in their best interests to terminate their parental rights, and she seems to offer this as an independent basis for termination.
The lack of provision for a dispositional hearing under the present statutory scheme presents some of the same issues as the aforementioned lack of provision for “diligent efforts.” Likewise, so as not to work a denial of due process or equal protection to the mentally retarded, the court must construe the omission of requirement of a dispositional hearing under Social Services Law § 384-b (4) (c) as discretionary (Matter of Chance Jahmel B., 187 Misc 2d 626), and also as contemplating a prior determination by clear and convincing evidence that a mentally retarded parent is unable to care for her children for the foreseeable future and until such a determination “best interests” is not an issue to be considered. (Smith v Organization of Foster Families for Equality & Reform, 431 US 816; Matter of Sylvia M., supra; Matter Corey L v Martin L, 45 NY2d 383.) The issue of “best interests” cannot usually be completely or competently addressed within the context of the fact-finding which would appear to be the conclusion of the Legislature in regard to permanently neglectful parents, by providing them with a separate and distinct hearing on the issue of disposition. A separate hearing protects respondents *275 from a determination of status, i.e., permanently neglectful, abandoning, mentally ill, mentally retarded, influenced by considerations of a child’s presumed interests. A determination of status has a profound affect on what dispositions are legally permissible[6] and are salutary to the child’s “best interest” and ultimate welfare where that decision is appropriate. In no instance can a determination be made that a child’s “best interests” is a simple equation of where the child is “better off.” Almost every natural parent would lose such a determination because foster parents are by definition “better off’ generally speaking than natural parents, or at least one would hope so. If that were the test the state would be faced with permanently caring for almost all of the children who are placed in foster care. (Matter of Corey L v Martin L, supra; Matter of Sanjivini K., 47 NY2d 374; Matter of Michael B., supra.) There is no basis or authority for determining that the statutory scheme will allow for an independent determination of “best interests” unrelated to the respondent’s incapacity. To so construe the statute would violate the respondent’s rights of due process and equal protection which remain intact prior to an adjudication of incapacity for the foreseeable future. (Matter of Sylvia M., supra; Stanley v Illinois, 405 US 645; Santosky v Kramer, 455 US 745; Matter of Michael B., supra; see also, J.T. v Arkansas Dept. of Human Servs., 947 SW2d 761, 769 [Thornton, J., dissenting].)
Conclusion
The respondent’s claim that the agency has failed to establish that she is mentally retarded based on an alleged head trauma suffered when she was about two years old is without merit. Mental Hygiene Law § 1.03 (21) defines mental retardation as “subaverage[7] intellectual functioning which originates during the developmental period and is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treat *276 ment and rehabilitation.” Dr. Berrill opined that there was no indication that such a trauma can be ascribed as a causative factor in respondent’s present mental status. Additionally, the developmental period has been variously defined from during gestation to age 18. (See, Hayman, Presumptions of Justice: Law, Politics, and the Mentally Retarded Parent, supra.) The respondent also failed to raise the Americans with Disabilities Act or any constitutional questions or defects at the trial of this proceeding and noted the possible applicability of these issues in this matter for the first time at summation which was improper, and for that reason the direct applicability of the ADA as a defense to this case is not at issue. However, the issue of due process and equal protection may be implicated by the agency’s failure to appropriately assess the respondent, to establish a plan for the respondent, to provide services for reunification and to present evidence of its diligent efforts to do so.
The underlying assumptions of the statutory scheme of profound immutable incapacity are not characteristic of the typical respondent now appearing under these provisions and therefore the court must remain vigilant to the possibility, or probability, of invoking a presumption of the respondent’s continuing incapacity with legally insufficient evidence. The presentation of evidence of diligent efforts in most instances is vital to avert a premature and factually unsupported determination of unfitness for the forseeable future and provides mentally retarded respondents the due process and equal protection to which they are entitled.
The respondent has shown, at very great odds, by a preponderance of the credible evidence that she is capable of caring for her children in the forseeable future in that representatives of OMRDD constituent agencies have testified as to her demonstrated ability to integrate training and counseling enabling her to provide care consonant with that already being provided by like situated mentally retarded individuals under the tutelage and supervision of “Synergia,” a residential treatment facility for retarded individuals and their children. This showing on the part of the respondent is distinguishable from that of each of the authorities cited by the Law Guardian and the petitioner in that she has without any assistance from the petitioner sought out and utilized treatment resulting in her significant progress in her “adaptive ability” and additionally has demonstrated that she can presently care for her children with the assistance which is now offered by an agency recog *277 nized by the State of New York as qualified to provide such assistance.
In view of the petitioner’s failure to adduce evidence of any reasonable and fair attempt to determine the “adaptive ability” of the respondent to provide adequate care for her children in an environment outside of her mother’s home, or that a plan for reunification of the subject children was otherwise determined to be deleterious to the children’s best interest and occasioned the foreclosure of planning for reunification prior to the institution of this proceeding and further concession of a lack of diligent efforts by its failure to rebut the respondent’s evidence of her present capacity, the petitioner has failed to sustain its burden by clear and convincing evidence.
For all the reasons stated the petition is dismissed.

. The Diagnostic and Statistical Manual of Mental Disorders: DSM-IV (4th ed) uses the term “adaptive functioning” and that is defined as “how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.” Adaptive functioning can be influenced by other factors “including education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with Mental Retardation.”

. See DSM-IV (supra at 40): “consideration should be given to the suitability of the instrument to the persons sociocultural background, education, associated handicaps (i.e., expressive speech problems), motivation and cooperation. For instance the presence of significant handicaps invalidates many adaptive scale norms.”

. The DSM-IV lists four degrees of mental retardation: (1) mild retardation, persons who have an IQ of 50 to 55 to approximately 70; (2) moderate retardation, persons who have an IQ of 35 to 40 to 50 to 55; (3) severe mental retardation, persons who have an IQ of 20 to 25 to 35 to 40; and (4) profound mental retardation, persons who have an IQ below 20 or 25. Borderline intellectual functioning does not come within the range of IQ’s defined under mental retardation. Borderline intellectual functioning is defined in the DSM-IV as persons who have an IQ of 71 to 84 (cf. levels of retardation in Hayman, Presumptions of Justice: Law, Politics, and the Mentally Retarded Parent, supra at 1214).

. While mental retardation and mental illness are quite different phenomena and not analogous for all purposes, this court uses them interchange *271 ably here only for the purpose of defining mutual areas of disparate treatment.

. Later decisions have determined that mentally retarded parents may be charged with permanent neglect. (Matter of Kimberly J., 216 AD2d 940; cf. Carrieri, Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 52A, Social Services Law § 384-b, 1999 Pocket Part, at 253.) Mental retardation and permanent neglect held not to be mutually exclusive. The commentator submits “that concepts of mental retardation and failure to plan are mutually exclusive.” (Id.)

. Nonneglectful parents who are unable to care for their children due to the children’s handicapping conditions which require “custodial care” are not the proper subject of neglect or termination proceedings. (See Joyner v Dumpson, 533 F Supp 233, revd 712 F2d 770 [Mansfield, J., concurring at 783-785] [where the Circuit Court reversed only in part and remanded the issue of whether the requirement made by the New York City Commissioner of Social Services that such parents relinquish temporary custody as a condition of receiving necessary services was a violation of the parents’ constitutional rights of due process and equal protection as applied].)

. Cf. DSM-IV definitions, supra; Hayman, Presumptions of Justice: Law, Politics and the Mentally Retarded Parent, supra at 1214.